UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BANK OF NEW YORK TRUST COMPANY,
N.A., AS TRUSTEE

                                  Interpleader Plaintiff,

                -against-

FRANKLIN ADVISERS, INC., FRANKLIN CLO II,
LTD., FRANKLIN CLO II, CORP., CDO PLUS
MASTER FUND, LTD., CHASE MANHATTAN
BANK LONDON NOMINEE FOR SEIRA 13, as a
nominee, DEUTSCHE BANK SECURITIES INC. as
a nominee, GENSEC IRELAND LIMITED as a
nominee, HARE & CO. as a nominee, MAC & CO. as
a nominee, MASSACHUSETTS MUTUAL LIFE
INSURANCE CO. as a nominee, MERRILL LYNCH,
PIERCE, FENNER & SMITH INC. as a nominee,
SUN LIFE ASSURANCE CO. OF CANADA as a
nominee, TEMPLETON GLOBAL ADVISORS,
LTD. as nominee, AND

"JOHN DOE #1" through "JOHN DOE #12," the last
twelve names being fictitious and unknown to
plaintiff, the persons or parties intended being the
beneficial owners of the Preferred Shares, the Series I
Combination Security, and the Class C-2 Notes under
the Indenture as more fully described in the
Complaint,

                          Interpleader Defendants.

Case No. 07 CIV 1746 (VM)

*Filed Electronically*

---

# MEMORANDUM OF LAW IN OPPOSITION TO
# THE MOTION OF FRANKLIN ADVISERS, INC. TO DISMISS
# THE CROSSCLAIMS OF CDO PLUS AND MERRILL LYNCH

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ i

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 5

ARGUMENT ...................................................................................................................... 7

      POINT I. FRANKLIN ADVISERS' MOTION IS PROCEDURALLY IMPROPER AND SHOULD BE STRICKEN ................................................................ 7

      POINT II. INDENTURE IPSA LOQUITUR: BY THE INDETURE'S PLAIN TERMS, THE PREFERRED SHAREHOLDERS ARE ENTITLED TO THE FUNDS AT ISSUE ....................................................................................................... 9

            The Definition of CCMF Tells the Court All That It Needs to Know ................ 10

            The Indenture First Requires a Determination of the Maximum CCMF That Could be Paid to Franklin Advisers, if Earned and Payable. That Amount is $337,287.32 as of February 28, 2007 .................................................... 10

            No CCMF Was Earned, and Therefore, No CCMF is Payable ........................... 13

            Franklin Advisers' Argument for a Super-Sized CCMF of $7,220,000 is at Odds With the Clear and Unambiguous Language of the Indenture ..................... 18

CONCLUSION ................................................................................................................. 22

EXHIBITS

| | |
|---|---|
| Exhibit A. | Indenture § 1.1 Definition: Contingent Collateral Management Fee |
| Exhibit B. | Indenture § 1.1 Definition: Interest Accrual Period |
| Exhibit C. | Indenture § 1.1 Definition: Principal Proceeds |
| Exhibit D. | Indenture § 1.1 Definition: Due Period |
| Exhibit E. | Indenture § 1.1 Definition: Distribution Date |
| Exhibit F. | Indenture § 11.1 |
| Exhibit G. | Indenture § 9.1 |
| Exhibit H. | Indenture § 1.1 Definition: Subordinated Collateral Management Fee |
| Exhibit I. | Contingent Collateral Management Fee Certification |

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Calcutti v. SBU, Inc.,*
  273 F.Supp.2d 488 (S.D.N.Y. 2003)..................................................................... 8

*Federal Ins. Co. v. Americas Ins. Co.,*
  258 A.D.2d 39, 691 N.Y.S.2d 508 (1st Dep't 1999) ........................................... 20

*Freedberg v. Landman,*
  930 F. Supp. 851 (E.D.N.Y.), *aff'd*, 112 F.3d 503 (2d Cir. 1996)......................... 20

*Greater Eastern Transport LLC v. Waste Mgmt. of Conn.,*
  211 F.Supp.2d 499 (S.D.N.Y. 2002)..................................................................... 8

*Helprin v. Hascourt,*
  277 F. Supp.2d 327 (S.D.N.Y. 2003)..................................................................... 7

*In re Ames Dept. Stores, Inc.,*
  306 B.R. 43 (Bankr. S.D.N.Y. 2004)..................................................................... 15

*In re Vause,*
  886 F.2d 794 (6th Cir. 1989) ................................................................................ 15

*Minerals Techs., Inc. v. OMYA AG,*
  406 F.Supp.2d 335 (S.D.N.Y. 2005)..................................................................... 8

*Segen v. Westcliff Capital Mgmt., LLC,*
  299 F.Supp.2d 262 (S.D.N.Y. 2004)..................................................................... 20

**Rules**

Fed. R. Civ. P. 12(b)(6)..................................................................................... 1, 7, 22

Hon. V. Marrero Indiv. Prac. II(A) ..................................................................... 7

Defendants CDO Plus and Merrill Lynch ("Claimants"), preferred shareholders of a collateralized loan obligation venture ("CLO II"), respectfully submit this Memorandum of Law in opposition to the putative Fed. R. Civ. P. 12(b)(6) Motion of Defendant Franklin Advisers, Inc. ("Franklin Advisers"), the former Collateral Manager of CLO II, to dismiss the Claimants' Crossclaims herein.[1]

## PRELIMINARY STATEMENT

"The most insidious deceptions are built around elements of truth." Regrettably, Franklin Advisers' motion proves this venerable proposition in abundance.

Specifically, Franklin Advisers has woven an artful tale of how it would like the Indenture to read – inserting indented, multi-line phrases that are not quotations from the Indenture, but are followed by citations to the Indenture that clearly are intended to make the Court believe otherwise. *See, e.g.*, Fr. Mem. at pp. 6-7. These "faux quotes" track the actual language of the Indenture to some extent, but only to some extent. By adding a subtle word or phrase where supportive of Franklin Advisers' cause, and by dropping a word or phrase that is

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Answer and Crossclaims of Defendants CDO Plus and Merrill Lynch. References to Franklin Advisers' Memorandum of Law filed in support of its motion shall be made as "Fr. Mem."

For the Court's convenience, a copy of the full Indenture, as well as a copy of Claimants' Answer and Crossclaims, are attached to the Declaration of James C. McCarroll in Opposition to Franklin Advisers' Motion to Dismiss the Crossclaims of CDO Plus and Merrill Lynch, as Exhibits 1 and 2.

material but inconvenient, Franklin Advisers seeks to put before this Court a document that simply does not exist.2

Franklin Advisers goes even further, to fabricate a definition of "12% hurdle" that exists nowhere in any document relevant to this matter.  It does this in an effort to twist the clear definition of Contingent Collateral Management Fee in the Indenture ("CCMF") to make it mean a $7,220,000 fee that magically becomes payable if the Preferred Shareholders will receive a 12% internal rate of return on their investment – not as of each of the preceding 22 quarterly Distribution Dates, as would have been required for Franklin Advisers to have earned such a fee – but, rather, as of disbursement of the final dollar in CLO II, on the Redemption Date.  Fr. Mem. at pp. 1-3.  According to Franklin Advisers, this is so because "the calculation of whether the 12% hurdle has been reached requires an accounting that includes all amounts that will be received on the relevant Distribution Date...."  Fr. Mem. at p. 9 (emphasis added).

But that is not what the Indenture says.  What the Indenture actually says is that a CCMF, in a maximum amount calculated pursuant to the terms of the Indenture,

> "...will be payable on each Distribution Date only to the extent that (i) the holders of the Preferred Shares have received an internal rate of return of 12% per annum...."

Indenture § 1.1, p. 16 (emphasis added).  Not "will have received" – "have received."

When it is not making up Indenture language, Franklin Advisers is busy ignoring it.  For example, the definition of CCMF provides that it is a fee payable "in arrears on each Distribution Date . . . ."  Indenture § 1.1, p. 16 (emphasis added).  This phrase is a term of art

---

2 Franklin Advisers does all of this while maligning Merrill Lynch and CDO Plus as greedy, "opportunistic investors."  It does this, of course, without advising the Court that Merrill Lynch and CDO Plus, as holders of the equity of CLO II, bore all the risk of ultimate performance of the entity, while Franklin Advisers has already been paid more than $21,000,000 for its risk-free, minimally time-consuming efforts as Collateral Manager.

and obviously significant.  Not even Franklin Advisers can claim this is the kind of language one would use thoughtlessly or by chance.  To the contrary, as Franklin Advisers well knows, the language is critical in the context of this matter.

So how does Franklin Advisers deal with the "in arrears" language?  Simple.  It pretends the language is not there.  The Court will scour Franklin Advisers' Memorandum in vain and never find a reference to the term "in arrears," even though it is a vital part of the definition of the CCMF that Franklin Advisers seeks.

In addition to re-writing the Indenture, Franklin Advisers makes up words to put in Claimants' mouth.  Thus, it repeatedly argues the Claimants have "admitted" that if the proceeds of sale of the collateral were included in the computation, Franklin Advisers would be entitled to the $7,220,000 CCMF on February 28, 2007.  Fr. Mem. at p. 8.  But Claimants have admitted no such thing.  For Franklin Advisers to assert this, when it is clear from Paragraphs 53 and 54 of the Claimants' Answer and Crossclaims that Claimants categorically deny it, is not fair advocacy, but fantasy advocacy.

In fact, under the terms of the Indenture, even if the proceeds of the collateral were included in the computation, Franklin Advisers would not be entitled to any CCMF, let alone one of $7,220,000.  Under the Indenture, Franklin Advisers was required to submit a certificate to the Indenture Trustee six business days prior to any quarterly Distribution Date for which it claimed to have earned a CCMF, certifying the amount of the CCMF that it had earned during the quarter ending immediately prior to the preceding Distribution Date.  Franklin Advisers had 22 opportunities to do that – for each quarter during which it now alleges, for the first time, that a CCMF was earned.  But it never submitted any such certificate.  To the contrary, Franklin Advisers submitted its sole certificate on February 28, 2007 – the

Redemption Date – six business days <u>after</u> the due date for a certificate that would have resulted in payment of any CCMF on February 28, 2007.

Submitting a certificate on February 28 may have entitled Franklin Advisers to payment of a CCMF on May 28, 2007 – if there had been a May 28, 2007 Distribution Date – but even then, the amount would have been nowhere near $7,220,000.  As demonstrated below, the amount of any CCMF that could be payable to Franklin Advisers even if there were an additional Distribution Date following the Redemption Date, would be $337,287.30.  But since there was no such Distribution Date, and the life of CLO II ended on February 28, 2007, Franklin never became entitled to this $337,287.30 CCMF payment – or any other.

The Indenture is a 187 page document that contains innumerable definitions, cross-references and exhibits.  It creates a deliberate latticework of rights and payment priorities.  It is clear and unambiguous in its terms, but it definitely is not easy reading.   In no case would it be appropriate for a party to play fast and loose with the language of a document at issue before the Court, but it is particularly irresponsible for Franklin Advisers to do so here – to misquote, omit or deny the existence of critical language that is in this lengthy document – even in its avaricious pursuit of a $7,220,000 fee.

To foreclose any further mudslinging or misquoting by Franklin Advisers, we lay out below, and in the Exhibits to this Memorandum of Law, the actual language of the Indenture, as we discuss how it applies to the facts of this case.

## FACTUAL BACKGROUND

For purposes of this motion, the factual background of this matter can be simply stated. CLO II was formed in July 2001, as an investment trust comprised of various corporate debt obligations which are pledged as collateral for the investors' benefit pursuant to the Indenture. Indenture at pp. 1-2; McCarroll Decl., Exh. 1. Most of the CLO II investors are noteholders, and are entitled to quarterly interest payments on their notes. But some – like Claimants – are equity holders, denominated "Preferred Shareholders." Unlike the noteholders, whose payments are guaranteed and secured by the collateral of CLO II, the Preferred Shareholders take the risk of CLO II's investments, and thus are the residual beneficiaries, i.e., if funds remain after all payments permitted pursuant to the Indenture are made, those funds are paid to the Preferred Shareholders. Indenture § 11.1.

Franklin Advisers is the Collateral Manager for CLO II. Franklin Advisers received two different types of guaranteed fees for its work, totaling payments of more than $21 million over the life of the venture. The largest of these fees – the Base Collateral Management Fee – was paid each quarter, throughout the life of CLO II, before even the noteholders received any distribution. The smaller of the two fees – the Subordinated Collateral Management Fee – also was paid throughout the life of CLO II, and was paid each quarter before any payment was made to the Preferred Shareholders.

Franklin Advisers now claims that it is entitled to an additional, third fee – a Contingent Collateral Management Fee. It asserts this is so because the Preferred Shareholders will have received a cumulative internal rate of return equal to or greater than 12% when the last distribution of liquidation proceeds is made to them, as residual beneficiaries, on the last

day of CLO II's life.  No such fee was earned on any of the prior 22 Distribution Dates – nor is it earned based upon the liquidation value of the collateral on the last day of CLO II's life.

But even if Franklin Advisers were correct in its argument for payment of a CCMF – which it is not – as demonstrated below, the maximum CCMF that Franklin Advisers could be entitled to would be $337,287.30.  Its claim for an additional $6,882,712.70 (which would bring its total fees to nearly $30,000,000), is not allowable under the terms of the Indenture, and is grossly unfair to Preferred Shareholders like Claimants, who assumed all of the risks of CLO II and, unlike Franklin, never received any guaranteed payments.

As demonstrated below, the actual terms of the Indenture provide a clear, unambiguous framework whereby, for Franklin Advisers to receive any CCMF, it would have had to **earn** such a fee by reason of the Preferred Shareholders' having received a 12% internal rate of return by the end of a defined quarterly period prior to the period that ended on February 28, 2007; additionally, such a fee would have had to be **payable**, pursuant to the Priority of Payments waterfall contained in the Indenture; and Franklin Advisers would have had to **certify** its entitlement to such a fee.  As demonstrated below, none of these conditions was satisfied here.  And even Franklin Advisers seems to admit that if it is not entitled to these fees, then they revert to the residual beneficiaries, the Preferred Shareholders.

## ARGUMENT

### POINT I

### FRANKLIN ADVISERS' MOTION IS
### PROCEDURALLY IMPROPER AND SHOULD BE STRICKEN

Ordinarily, it would not be necessary to discuss the legal standards applicable on a R. 12(b)(6) motion – such as the requirement that Franklin Advisers must show there is no rational reading of the Indenture that would entitled Claimants to relief – since the Court is well aware of these standards. *See, e.g., Helprin v. Hascourt*, 277 F. Supp.2d 327, 330-31 (S.D.N.Y. 2003). However, the peculiar – or, more precisely, bogus – nature of Franklin Advisers' motion requires Claimants to do so.

First, despite its styling this a R. 12(b)(6) motion, Franklin Advisers cites throughout to a variety of sources other than the Crossclaims and the Indenture which they incorporate. *See, e.g.*, Fr. Mem. at p. 4. Franklin Advisers even asks for a money judgment based on a computation in its own Crossclaim, which computation was disputed by Claimants in their answer. *See* Fr. Mem. at p. 14. Franklin Advisers thus is not moving under R. 12(b)(6) at all, but making a shadow motion for summary judgment. Why did it not do so straightforwardly? Because that would have required it to obtain the prior approval of the Court, (Hon. V. Marrero Indiv. Prac. II(A)), at which time Claimants would have sought leave to make a like motion and the Court would have set a comprehensive briefing schedule that was fair to all parties.

By disregarding the Court's rules and filing this motion before answering, Franklin Advisers has obtained for itself the right of reply. This misconduct, however, is likely to avail Franklin Advisers naught. No matter how many "last words" Franklin Advisers

misappropriates for itself, the Indenture still says what the Indenture says; and it says that the monies here involved go to the Preferred Shareholders, and not to the Collateral Manager. Nevertheless, this is a flagrantly improper practice on Franklin Advisers' part, and for that reason its Motion should be stricken with prejudice and costs.

If, however, the Court chooses to entertain this motion, it should <u>not</u> convert it to a summary judgment motion with the attendant discovery, delay and expense. *See Calcutti v. SBU, Inc.*, 273 F.Supp.2d 488 (S.D.N.Y. 2003). Rather, it should hold Franklin Advisers to its position that the Indenture – and only the Indenture – need be considered, and that the Court can resolve the ultimate rights of Claimants and Franklin Advisers by conclusively interpreting the Indenture on this motion. Fr. Mem. at pp. 13-14. If the Court holds Franklin Advisers to its word, then, as shown below, the Preferred Shareholders are entitled to the monies in dispute, and the Court should issue a judgment in their favor so declaring.

Finally, all parties agree that the Indenture is unambiguous (Fr. Mem. at p. 8). Therefore, there is no need to make extensive reference to rules of construction under governing New York law (Indenture § 14.10) to aid the Court in its interpretation. Again, the Court is well aware that in contracts involving sophisticated commercial parties, the contract language should be deemed definitive; that contracts are to be interpreted as an integrated whole and should be deemed unambiguous when, to a reasonably knowledgeable person who has read the agreement as a whole, the terms suggest only one meaning; and that punctuation and sentence structure should be considered in determining proper interpretation of the document. *See, e.g., Minerals Techs., Inc. v. OMYA AG*, 406 F.Supp.2d 335 (S.D.N.Y. 2005); *Greater Eastern Transport LLC v. Waste Mgmt. of Conn.*, 211 F.Supp.2d 499 (S.D.N.Y. 2002).

Because there is no ambiguity here, and for the reasons set forth below, the Court should interpret the Indenture to award the funds at issue to the Preferred Shareholders.

## POINT II

### INDENTURE IPSA LOQUITUR:
### BY THE INDENTURE'S PLAIN TERMS,
### THE PREFERRED SHAREHOLDERS
### ARE ENTITLED TO THE FUNDS AT ISSUE

Though long on invective and hyperbole, Franklin Advisers' motion is noticeably short on analysis of the Indenture. Indeed, as set forth above, Franklin bases its motion on language that simply is not in the Indenture. But despite its efforts to manipulate, Franklin Advisers makes a fatal error: <u>it admits that the language of the Indenture is unambiguous</u>. On this one point, Claimants agree entirely with Franklin Advisers. When the Indenture is read closely, with all of its related parts considered together, Franklin Advisers' arguments fail of their own weight.

Ordinarily, when dealing with a dense and lengthy document such as the Indenture, parties make appropriate use of ellipses in briefing, to highlight for the Court only the relevant provisions. However, Franklin Advisers – <u>which does not present to the Court a single complete quote from the Indenture</u> – has foreclosed that option by falsely accusing Merrill Lynch and CDO Plus of using ellipses to mislead.

To avoid this kind of mudslinging, and to ensure that the Court has at hand all of the portions of the Indenture necessary for its proper interpretation, Claimants present as Exhibit A hereto the complete definition of Contingent Collateral Management Fee, precisely as found in Indenture § 1.1. As may be seen, due to the density of the definition, it cannot be fully understood without reference to certain key definitions found elsewhere in the Indenture.

Therefore, those definitions are attached hereto as Exhibits B through H. Finally, to defuse Franklin Advisers' false claims of misuse of the dreaded ellipses, Claimants provide below the full text of certain key portions of the relevant definitions – supplementing the Court's ability to view the full text of all relevant definitions at any time in Exhibits A through H.

        As admitted – but tellingly, not proffered – by Franklin Advisers, the following plain language of the Indenture speaks for itself, and therefore constitutes everything that this Court will need to review in order to determine the proper resolution of this Interpleader Action and, consequently, the Crossclaims of Merrill Lynch and CDO Plus. As will become apparent, that resolution is quite the opposite of dismissal of the claims of Merrill Lynch and CDO Plus – it is entry of judgment in their favor.

**The Definition of CCMF Tells the Court All That It Needs to Know**

        The definition of CCMF is most easily understood if considered in three distinct but interdependent parts. The language of each part contains multiple defined terms, but, when read carefully with those definitions in mind, makes clear that Franklin Advisers is not entitled to any CCMF for several reasons. Below, Claimants first provide the exact text of each part of the definition, then demonstrate the application of each part of the definition to the facts at issue in this action.

        **The Indenture First Requires a Determination of
the Maximum CCMF That Could be Paid
to Franklin Advisers, if Earned and Payable.
<u>That Amount is $337,287.32 as of February 28, 2007</u>**

        The fist part of the CCMF Definition ("<u>CCMF Definition Part One</u>") becomes relevant only if the threshold requirements in the second and third parts of the CCMF Definition for payment of a CCMF in any amount are satisfied. However, as it appears first, the CCMF

Definition is most easily understood if one first marches through CCMF Definition Part One. When applied to the facts of this case, CCMF Definition Part One makes clear that the maximum CCMF Franklin Advisers could possibly be entitled to is $337,287.32.

CCMF Definition Part One runs from the start of the definition, in Section 1.1, on Page 16 of the Indenture, through the terms "provided, however,":

> "Contingent Collateral Management Fee": The fee payable for each Interest Accrual Period to the Collateral Manager in arrears on each Distribution Date pursuant to Section 8 of the Collateral Management Agreement and Section 11.1 hereof, in an amount (as certified by the Collateral Manager to the Trustee), equal to 0.25% per annum (calculated on the basis of a 360-day year consisting of twelve 30-day months) of the sum of (i) the Aggregate Principal Amount of the Pledged Collateral Obligations and Eligible Investments representing Principal Proceeds outstanding on the first day of the Due Period preceding such Distribution Date plus (ii) all Cash representing Principal Proceeds held by, or on behalf of, the Trustee for the benefit of the Noteholders on the first day of the Due Period preceding such Distribution Date, prorated for the number of days in the related Due Period; provided, however,

Indenture § 1.1, p. 16; Exh. A.

The foregoing language provides a formula to calculate the maximum CCMF that could be payable to Franklin Advisers on any Distribution Date, including the Redemption Date, if the conditions for payment found later in the CCMF definition were met. It first provides that the computation to be made will apply to an "Interest Accrual Period." That definition is found in Indenture § 1.1, on page 27:

> "Interest Accrual Period": Subject to Section 14.9, the period from (and including) the Closing Date to but excluding the first Distribution Date, and each successive period from and including each Distribution Date to but excluding the following Distribution Date until the principal of the Notes, as applicable, is paid or made available for payment.

Indenture § 1.1, p. 27; Exh. B. This informs that the Interest Accrual Period relevant to the Redemption Date ran from November 28, 2006 (from and including that Distribution Date) through February 27, 2007 (to but excluding the February 28, 2007 Redemption Date).

Knowing this, one can apply the formula found in subsections (i) and (ii) of CCMF Definition Part One. But to do so, it first is necessary, at minimum, to determine the definitions of "Principal Proceeds" and "Due Period."

The definition of "Principal Proceeds" is lengthy, but it can be summarized simply as the proceeds held by or on behalf of CLO II, from loans in which CLO II held an ownership interest or economic rights, net of any proceeds that are designated as Interest Proceeds. *See* Exh. C. CCMF Definition Part One directs the utilization of the amount of Principal Proceeds held or controlled by CLO II "on the first day of the Due Period preceding such Distribution Date...."[3] Therefore, it is a simple calculation, once the definition of "Due Period" is determined.

The Definition of "Due Period" is found in Indenture § 1.1, on page 22:

> "Due Period": With respect to any Distribution Date, the period commencing immediately following the seventh Business Day prior to the preceding Distribution Date (or on the Closing Date, in the case of the Due Period relating to the first Distribution Date) and ending on the seventh Business Day prior to such Distribution Date (or, in the case of a Due Period that is applicable to the Distribution Date that is the Stated Maturity of any Note, or the Maturity of all Outstanding Notes, ending on the day preceding such Distribution Date).

Indenture § 1.1, p. 22; Exh. D.

To determine the first day of the Due Period applicable to the February 28, 2007 Redemption Date, one simply calculates the date "immediately following the seventh Business Day prior to the preceding Distribution Date." The Distribution Date preceding February 28, 2007, was November 28, 2007. *See* Indenture, § 1.1, p. 21; Exh. E. The seventh Business Day prior to November 28, 2006, was November 16, 2006 and, of course, the date immediately following that was November 17, 2006.

---

4  It is undisputed that the Redemption Date is a Distribution Date. Fr. Mem. at p. 2.

Therefore, pursuant to the plain, unambiguous terms of the Indenture, the maximum CCMF that could be payable to Franklin Advisers on February 28, 2007, was "equal to 0.25% per annum (calculated on the basis of a 360-day year consisting of twelve 30-day months) of the sum of" all Principal Proceeds held by CLO II on November 17, 2006. By the calculations of Merrill Lynch and CDO Plus, based upon their understanding of the total amount of Principal Proceeds in the possession of CLO II on or about November 17, 2006, this amount is $337,287.32 (the "Maximum Potential CCMF").

This should be the end of Franklin Advisers' claim of entitlement to a multi-million dollar CCMF. Once the Indenture formula is applied, the parties are reduced to arguing over payability of a $337,287.32 fee – an amount that surely will be exceeded by the parties' attorney fees in connection with Franklin Advisers' meritless arguments. But to add further insult to this injury, as demonstrated below, Franklin Advisers is not even entitled to the Maximum Potential CCMF of $337,287.32, pursuant to CCMF Definition Part Two and Part Three.

### No CCMF Was Earned, and Therefore, No CCMF is Payable

The second part of the CCMF definition ("CCMF Definition Part Two") deals not with the amount of the CCMF, but whether any CCMF is due at all, and provides that any CCMF calculated pursuant to the formula found in CCMF Definition Part One will be paid only if it is "**earned**" and "**payable**." Read carefully, CCMF Definition Part Two makes clear that no CCMF has been earned by, or is payable to, Franklin Advisers.

CCMF Definition Part Two runs from the terms "provided, however," through the terms "provided, further," in Section 1.1, on Page 16 of the Indenture:

provided, however, that the Contingent Collateral Management Fee will be payable on each Distribution Date only to the extent that (i) the holders of the Preferred Shares have

13

received an internal rate of return of 12% per annum (based upon quarterly payment periods and calculated using an assumed purchase price of $1.00 per Preferred Share) on the amount of the initial purchase price of the Preferred Shares for the period from the Closing Date through such Distribution Date and (ii) funds are available for such purpose in accordance with the Priority of Payments described under Section 11.1 hereof; provided, further,

Indenture § 1.1, p. 16; Exh. A.

Thus, the language of CCMF Definition Part Two informs that, to determine whether any CCMF calculated pursuant to the formula in CCMF Definition Part One will be payable, one must look first to whether it has been earned, by virtue of the Preferred Shares' having received a 12% internal rate of return, and then to whether it is payable, from funds available for such purpose pursuant to Indenture § 11.1. This is the portion of the CCMF definition on which Franklin Advisers focuses nearly all of its efforts.

Specifically, Franklin Advisers focuses on the phrase "**through such Distribution Date**" in CCMF Definition Part Two, with reference to the Preferred Shares having received a 12% internal rate of return. It trumpets this phrase as the definitive indicator that one must look forward to the last dollar to be paid on the Redemption Date, then carry it back up the Priority of Payments waterfall to pay that dollar to Franklin Advisers if the Preferred Shares will have reached a 12% internal rate of return as of the last payment ever made by CLO II.

But, this is a concept found nowhere in the Indenture. Because of this, as noted above, Franklin Advisers even goes so far as to interpose artificial supporting language into the Indenture, through its "faux quotes." If the false definition that Franklin Advisers attempts to create has not already been fully discredited, a review of the plain terms of the Indenture will clarify why it should be.

14

Franklin Advisers ignores, among other things, the following explicit language of the Indenture:

> ➢ The CCMF Definition begins as follows:  "The fee payable for each Interest Accrual Period to the Collateral Manager **in arrears** on each Distribution Date...."  (emphasis added).

> ➢ The clause in CCMF Definition Part Two where Franklin Advisers fixates on the phrase "through such distribution date" begins with "(i) the holders of the Preferred Shares **have received** an internal rate or return of 12%..." (emphasis added).

> ➢ Finally,  Franklin Advisers ignores subsection (ii) of CCMF Definition Part Two, which makes a CCMF payable only to the extent that "funds are available for such purpose in accordance with the Priority of Payments described under Section 11.1 hereof...."

Franklin Advisers' principal argument – that "through" must mean "through and including" – fails under the plain language of the Indenture.  Moreover, such an interpretation of the word "through" would ignore the explicit backward-looking statements – "in arrears" and "have received" – in the CCMF Definition.  Case law interpreting the phrase "in arrears" confirms its intuitive, backward-looking meaning. *See generally, In re Vause*, 886 F.2d 794, 796 (6th Cir. 1989) (characterizing a farm lease for which rent was due every December 1 for use during the preceding season as being payable in arrears); *In re Ames Dept. Stores, Inc.*, 306 B.R. 43, 70 (Bankr. S.D.N.Y. 2004) ("in arrears" means "after the amount to be billed becomes known").

To settle any remaining definitional dispute, one may look further to Indenture § 11.1 to determine whether funds would be available to pay the Maximum Potential CCMF, even if such a fee were earned (which it has not been). Franklin Advisers has criticized Merrill Lynch's and CDO Plus' "too literal" reading of the waterfall provisions in Indenture § 11.1. This criticism highlights Franklin Advisers' fear of the Court's fully understanding the workings of Indenture § 11.1.

Indenture § 11.1 establishes the priorities pursuant to which every dollar that leaves CLO II must be distributed. It is clear and unambiguous, and not subject to plain language-defying, or gravity-defying, interpretation. The full text of this governing Indenture provision can be found at Exhibit F hereto, but the most relevant portions of the provision are as follows:

11.1. <u>Disbursements of Monies from Payment Account</u>.

(a) Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section, Article 9, and Section 13.1, on or, with respect to amounts referred to in Section 11.1(d), before each Distribution Date, the Trustee shall disburse amounts ... as follows and for application by the Trustee in accordance with the following priorities (the "Priority of Payments"):

...

(ii) On each Distribution Date, Principal Proceeds shall be applied as follows:

...

(J) to the payment of all due and unpaid Contingent Collateral Management Fees, but only to the extent not paid in full pursuant to subclause (O) of clause (i) above;

(k) to payment of Class C-2 Second Additional Interest; and

(L) any remaining Principal Proceeds to the Preferred Share Paying Agent for payment to the Holders of the Preferred Shares pursuant to the Preferred Share Documents, to the extent legally permitted.

Indenture § 11.1; Exh. F.

This type of provision is commonly called a "waterfall" because it functions precisely like an organic waterfall, in that if there is no pool available at a plateau in the waterfall, the liquid funds cascading downward will continue downward. Once those funds have reached the next plateau, they can never travel back up the waterfall. As shown above, and in Exhibit F hereto, there is no provision for such upward movement in Indenture § 11.1. Similarly, there is no provision for a forward-looking calculation of a CCMF to be paid at Principal Proceeds Waterfall Step J (Indenture § 11.1(a)(ii)(J)) which, read together with the CCMF Definition, makes clear that whether or not the Maximum Potential CCMF is payable must be determined based upon what the Preferred Shares **have received on the prior Distribution Date** – November 28, 2006 – not what they will receive on the Redemption Date (the final Distribution Date).

In sum, because there is no provision for a "forward-looking" calculation of what internal rate of return will be received by the Preferred Shares at the later-in-time Principal Proceeds Waterfall Step L, at the time of the distribution at Principal Proceeds Waterfall Step J, the Preferred Shares **have not received** a 12% internal rate of return, and no CCMF has been **earned** by Franklin Advisers.

This is further confirmed by Indenture § 9.1(e), which states:

> (e) After payment of the Notes and the expenses of the Co-Issuers on any Redemption Date, the Trustee shall pay (i) first, to the Class C-2 Redemption Additional Interest and (ii) second to the Preferred Share Paying Agent, for distribution to the Holders of the Preferred Shares as liquidating distributions, all remaining proceeds from the sale and/or termination of the Collateral and all other funds in the Collection Account.

Indenture § 9.1(e); Exh. G.

This provides the last nail in the coffin for Franklin Advisers' plain language – and gravity – defying Principal Proceeds flow-back argument, affirming that no CCMF has

17

been **earned**.  As made clear by CCMF Definition Part One, even if a CCMF had been earned

by virtue of the Preferred Shareholders' having received a 12% internal rate of return (which is

not the case), the maximum amount of any such CCMF would be the Maximum Potential

CCMF ($337,287.32).  However, because the Maximum Potential CCMF was not **earned**, it

cannot be **payable** pursuant to Indenture § 1.1, meaning that Franklin Advisers is entitled to no

CCMF at all.

> **Franklin Advisers' Argument for a Super-Sized**
> **CCMF of $7,220,000 is at Odds With the**
> **Clear and Unambiguous Language of the Indenture**

The third section of the CCMF Definition ("CCMF Definition Part Three") need

be considered on any Distribution Date, including the Redemption Date, only following

calculation of the maximum CCMF that could be payable, pursuant to CCMF Definition Part

One – in this case, the Maximum Potential CCMF of $337,287.32 – and then only if the

Maximum Potential CCMF has been **earned**, by virtue of the Preferred Shares having received

a 12% internal rate of return as of the preceding Distribution Date (which they had not), and

only if the Maximum Potential CCMF is **payable** from funds available pursuant to the Priority

of Payments (which it is not).  Therefore, there is no need to consider CCMF Definition Part

Three under the facts of this case.

Franklin Advisers seeks to divert the Court's attention from the inapplicability of

CCMF Definition Part Three by pointing to certain language within CCMF Definition Part

Three – specifically, the reference to an "accrued and unpaid" CCMF for prior Due Periods.

This language, Franklin Advisers says, should be read to provide it payment of a CCMF that

somehow has accrued from the first day of CLO II's existence – notwithstanding the clear

requirements under the Indenture that in order for any CCMF to accrue, it must have been

earned by the Preferred Shares' having received a 12% internal rate of return, but there being

insufficient funds then available to pay the CCMF.  To defuse this last attempt by Franklin

Advisers to mislead, Claimants will address the language of CCMF Definition Part Three.

CCMF Definition Part Three runs from the terms "provided, further," through

the end of the definition, in Section 1.1, on Pages 16 through 17 of the Indenture:

> provided, further, that the Contingent Collateral Management Fee payable on each
> Distribution Date will be equal to the lesser of (i) the accrued and unpaid Contingent
> Collateral Management Fee (consisting of the Contingent Collateral Management Fee
> accrued for the related Interest Accrual Period and any such fee accrued for prior Due
> Periods but not paid on any prior Distribution Date) that is payable on such Distribution
> Date as described above and (ii) 40% of (A) the Interest Proceeds or Principal Proceeds,
> as applicable, available and permitted to be used for such purpose in accordance with
> the Priority of Payments minus (B) the amount necessary to provide an internal rate of
> return (calculated as described above) to Holders of Preferred Shares of 12% per annum
> for the period from the Closing Date through such Distribution Date; provided, further,
> that such amount shall not be less than zero.

Indenture § 1.1, pp. 16-17; Exh. A.

As may be seen, there is no provision in the Indenture for accrual unless, as of a

prior Distribution Date, a CCMF was earned and was payable, but there were insufficient funds

available to pay it pursuant to the Priority of Payments waterfall.  An example of such a

situation would be the Maximum Potential CCMF of $338,287.32 that Franklin Advisers would

have earned as of May 28, 2007, had CLO II continued in existence.  If there were insufficient

Interest Proceeds and Principal Proceeds available as of that date to pay the Maximum Potential

CCMF pursuant to the Priority of Payments waterfall, then the Maximum Potential CCMF

would accrue, along with any additional CCMF that was earned and payable as of May 28,

2007, but could not be paid due to insufficient available proceeds.  Such accrued CCMFs would

then be payable on the next Distribution Date (August 28, 2007), or on a subsequent

Distribution Date when sufficient Interest Proceeds and/or Principal Proceeds were available to make such payments.

Were there any doubts as to whether CCMFs accrue when they are neither earned nor payable, those doubts would be resolved by the plain language of related provisions of the Indenture. There is a collateral management fee provided for in the Indenture that accrues whether or not it is payable: the Subordinated Collateral Management Fee, the full definition of which can be found in Exhibit H hereto. The salient provision of the definition of Subordinated Collateral Management Fee is the last sentence: "The Subordinated Collateral Management Fee will accrue from the Closing Date whether or not currently payable." Indenture § 1.1, p. 54; Exh. H.

This definition makes clear that when Franklin Advisers and the Indenture Trustee wished to provide for a collateral management fee to accrue whether or not it is payable, they knew how to say it in clear and unambiguous language. The absence of a similar provision in the CCMF Definition provides definitive evidence that no such accrual was intended under the doctrine of *expressio unius est exclusio alterius.*" *Segen v. Westcliff Capital Mgmt., LLC,* 299 F.Supp.2d 262, 271 (S.D.N.Y. 2004).

Finally, Franklin Advisers' failure to assert an entitlement to a CCMF as of each of the 22 Distribution Dates preceding the Redemption Date is telling, as this omission was directly at odds with the requirements of the Indenture if Franklin Advisers indeed believed that such a CCMF was to accrue each quarter. As is true of every material requirement for payment of a CCMF, the Indenture lays out the requirements for certification by Franklin Advisers of the amount of any CCMF to which it asserts entitlement on any Distribution Date. This particular procedure is laid out in Indenture § 11.1(e), on page 166:

(e)      In connection with the application of funds to pay Contingent Collateral
Management Fees in accordance with Section 11.1(a)(i)(O) and Section 1.1(a)(ii)(J), no
more than one Business Days after the Due Period ending prior to such Distribution
Date, the Collateral Manager shall deliver to the Trustee a calculation of the amount
payable on such Distribution Date.

Indenture § 11.1(e); Exh. F.

The foregoing provision required Franklin Advisers, if it claimed entitlement to
a CCMF, to deliver a certificate to the Indenture Trustee certifying the amount of the CCMF to
which it was entitled each quarter, no later than six business days prior to the applicable
Distribution Date ("one Business Days after the Due Period ending prior to such Distribution
Date"). But Franklin Advisers never delivered any such certificate – not for a single one of the
22 Distribution Dates preceding the Redemption Date.[4]  It also did not deliver such a certificate
on February 20, 2007 – the date when such a certificate was due with regard to any CCMF it
would be entitled to receive on the Redemption Date.  Instead, it waited until February 28, 2007
(the Redemption Date) to assert its baseless claim to entitlement of a $7,220,000 CCMF.  *See*
Contingent Collateral Management Fee Certification, attached hereto as Exhibit I.

Franklin Advisers never submitted a certificate pursuant to Indenture § 11.1(e)
prior to the Redemption Date for a very simple reason:  Because it knew that it was never
entitled to payment of any CCMF, or to have any CCMF accrue, prior to the Redemption Date.

Moreover, as demonstrated above, Franklin Advisers also is not entitled to
payment of any CCMF as of the Redemption Date.  Because the Maximum Potential CCMF of
$337,287.32 was not earned, nor was it payable, pursuant to CCMF Definition Part Two, the

---

5  Of course, the pre-litigation conduct of the parties is universally recognized as the best
    evidence of how a contract should be interpreted. *See Freedberg v. Landman*, 930 F. Supp.
    851, 856 (S.D.N.Y.), *aff'd*, 112 F.3d 503 (2d Cir. 1996); *Federal Ins. Co. v. Americas Ins.
    Co.*, 258 A.D.2d 39, 691 N.Y.S.2d 508 (1st Dep't 1999).

Court need not reach the foregoing analysis.  However, should it choose to do so, CCMF

Definition Part Three disposes of the last of Franklin Advisers' efforts to obtain for itself an

unearned windfall, and makes clear that judgment should be granted in favor of Merrill Lynch

and CDO Plus.

## **CONCLUSION**

Although it is not Claimants' burden to show that the governing contract can be

read only in its favor to defeat a R.12(b)(6) motion, Claimants have gone that extra mile –

because this Indenture, though cumbersome, when read in full context in accordance with its

plain terms, leads to only one result: that Franklin Advisers is entitled to no CCMF and that the

funds in dispute must be awarded to Claimants.


Dated: June 13, 2007
      New York, New York

                              REED SMITH LLP


                              By:/s/ James C. McCarroll_____
                                  James C. McCarroll (JM 2758)
                                  Lance Gotthoffer (LG 5932)
                                  599 Lexington Avenue
                                  New York, New York 10022
                                  (212) 521-5400