UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BANK OF NEW YORK TRUST COMPANY,
N.A., AS TRUSTEE

            Interpleader Plaintiff,

           -against-

FRANKLIN ADVISERS, INC., FRANKLIN CLO II,
LTD., FRANKLIN CLO II, CORP., CDO PLUS
MASTER FUND, LTD., CHASE MANHATTAN
BANK LONDON NOMINEE FOR SEIRA 13, as a
nominee, DEUTSCHE BANK SECURITIES INC. as
a nominee, GENSEC IRELAND LIMITED as a
nominee, HARE & CO. as a nominee, MAC & CO. as
a nominee, MASSACHUSETTS MUTUAL LIFE
INSURANCE CO. as a nominee, MERRILL LYNCH,
PIERCE, FENNER & SMITH INC. as a nominee,
SUN LIFE ASSURANCE CO. OF CANADA as a
nominee, TEMPLETON GLOBAL ADVISORS,
LTD. as nominee, AND

"JOHN DOE #1" through "JOHN DOE #12," the last
twelve names being fictitious and unknown to
plaintiff, the persons or parties intended being the
beneficial owners of the Preferred Shares, the Series I
Combination Security, and the Class C-2 Notes under
the Indenture as more fully described in the
Complaint,

            Interpleader Defendants.

Case No. 07 CIV 1746 (VM)

---

# MEMORANDUM OF LAW IN SUPPORT OF MOTION BY INTERPLEADER DEFENDANTS/ CROSS-CLAIMANTS CDO PLUS MASTER FUND, LTD., AND MERRILL LYNCH, PIERCE, FENNER & SMITH INC. FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................1

FACTUAL BACKGROUND ............................................................................2

    a) The Background and Formation of CLO II .................................................2

    b) The Indenture: The "Waterfall" .............................................................4

    c) The Indenture: Franklin's Fees............................................................5

    d) The Optional Redemption ..................................................................7

    e) The Instant Litigation........................................................................9

ARGUMENT ..............................................................................................10

    POINT I: INDENTURE PROVISIONS ARE UNIFORMLY INTERPRETED BY
           THE COURTS AS A MATTER OF LAW ..........................................10

    POINT II: ARTICLE 9 OF THE INDENTURE CONTROLS AND DIRECTS
           THAT NO CCMF WILL BE PAID ON AN OPTIONAL REDEMPTION .........15

    POINT III: EVEN UNDER ARTICLE 11, NO CCMF CAN BE DUE............................19

    POINT IV: A CCMF WOULD ONLY ACCRUE WHEN DUE AND PAYABLE,
           NOT FROM DAY ONE OF THE CLO II VENTURE.........................................22

CONCLUSION ...........................................................................................25

## TABLE OF AUTHORITIES

**Cases**

Bank of New York Trust, N.A. v. Franklin Advisors, Inc.,
  522 F.Supp.2d 632 (S.D.N.Y. 2007) ...................................................................... 10

Bank of New York v. Tyco Int'l Group,
  545 F.Supp.2d 312 (S.D.N.Y. 2008) .............................................................. 11, 12

Bethlehem Steel Corp. v. U.S.,
  434 F.2d 1357 (Ct. Cl. 1970)......................................................................... 14, 15

Broad v. Rockwell Int'l Corp.,
  642 F.2d 929 (5th Cir. 1981) (en banc), cert. den., 454 U.S. 965 (1981)........... 2, 12, 16, 18, 23

Columbia Gas Sys., Inc. v. U.S.,
  473 F.2d 1244 (2d Cir. 1973) .................................................................. 14, 15, 22

Finisar Corp. v. US Bank Trust Nat'l Ass'n,
  No. C 07- 4052 JF (PVT), 2008 US Dist LEXIS 65329 (N.D. Calif. Aug. 25, 2008) ............. 22

Gruppo, Levy & Co. v. ICOM Information & Commc'n Inc.,
  No.01 Civ.8922 JFK, 2003 WL 21511943 (S.D.N.Y. July 1, 2003)......................... 21

Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,
  723 F. Supp. 976 (S.D.N.Y. 1989) .................................................... 12, 18, 20, 22, 23

In re Loral Space and Commc'n Consol. Litig.,
  No. 2808-VCS, 2008 Del. Ch. LEXIS 136 (Del Ch. Sept. 19, 2008) ................................ 12, 18

Kaiser Aluminum Corp. v. Matheson,
  681 A.2d 392 (Del. 1996)....................................................... 2, 13, 15, 22, 25

Law Debenture Trust Co. v. Petrohawk Energy Corp.,
  No. 2422-VCS, 2007 Del. Ch. LEXIS 113 (Del. Ch. Aug. 1, 2007) aff'd, 947 A.2d 1121
  (Del. 2008)........................................................................................... 12

Loughman v. Unum Provident Corp.,
  536 F.Supp.2d 371 (S.D.N.Y. 2008) ........................................................... 21

Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,
  716 F.Supp. 1504 (S.D.N.Y. 1989) vacated on other grounds, 906 F.2d 884 (2d. Cir. 1990) . 11

Prescott, Ball & Turben v. LTV Corp.,
  531 F.Supp. 213 (S.D.N.Y. 1981) ................................................................ 15

Purcell v. Flying Tiger Line, Inc.,
  No. 82 Civ. 3505 (CES), 1984 U.S. Dist. LEXIS 24921 (S.D.N.Y. Jan. 12, 1984)..... 17, 20, 23

Segen v. Westcliff Capital Mgmt., LLC,
  299 F.Supp.2d 262 (S.D.N.Y. 2004) ........................................................... 23

Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,
  691 F.2d 1039 (2d Cir. 1982), cert. den., 460 U.S. 1012 (1983)...................................... 2, 11, 12

Unigard Sec. Ins. Co. v. Northern River Ins. Co.,
    4 F.3d 1049 (2d Cir. 1993) ........................................................................................... 12

United Health Group, Inc., v. Wilmington Trust Co.,
    548 F.3d 1124 (8th Cir. 2008) ...................................................................................... 22

United States Trust Co. v. Executive Life Ins. Co.,
    602 F. Supp. 930 (S.D.N.Y. 1984) ............................................................................... 11

**Other Authorities**

Robert B. Robbins, *Fundamentals of Securities Law: Preparation of the Registration Statement*,
    SNO71 A.L.I.-A.B.A 237 (2008) ...................................................................................... 3

**Rules**

Fed. R. Civ. P 12(b)(6)....................................................................................................... 9

CDO Plus and Merrill Lynch ("Claimants"), preferred shareholders of a collateralized loan obligation venture ("CLO II"), respectfully submit this Memorandum in support of their motion for summary judgment on their cross-claims herein, and to dismiss the cross-claims of Franklin Advisers, Inc. for payment of a $7.2 million "contingent collateral management fee."[1]

## PRELIMINARY STATEMENT

This case is uniquely well suited for summary judgment – summary judgment in favor of Claimants. At issue is whether, pursuant to a controlling indenture, Franklin Advisers, Inc. ("Franklin"), the Collateral Manager of CLO II, will receive as a contingent management fee the last $7.2 million derived from the liquidation of that venture (over and above the $14 million in assured management fees it has already received) or whether those monies will go to the shareholders of CLO II, who took all of the economic risks of the venture during its lifetime.

Claimants believe the resolution of this issue can – and must – be based on the language of the Indenture itself, and that, under the unambiguous terms of that document, Franklin's claim for this contingent fee must be dismissed with the funds at issue going to the Preferred Shareholders of CLO II.

Conversely, according to Franklin, the resolution of this issue should turn upon the "intent of the parties" to the Indenture, as that intent may be gleaned from its negotiating history (as recalled by Franklin's witnesses some seven years later) and other matters extrinsic to the

---

[1] Capitalized terms not otherwise defined shall have the meanings ascribed to them in the Answer and Crossclaims of Defendants CDO Plus and Merrill Lynch, dated April 20, 2007 ("CACC"). All documents, including deposition testimony (in alphabetical order), cited or referenced herein are attached as exhibits to the Affidavit of Lance Gotthoffer, dated April 7, 2009 (the "Gotthoffer Affidavit"). For the Court's convenience, attached to this Memorandum as Schedule A is a list of the deponents and their respective roles in the CLO II transaction.

language of the document; and that based on such extrinsic evidence, Franklin should receive a $7.2 million windfall. In so maintaining, Franklin tacitly admits what the Court's review of the Indenture will show: if forced to live by the terms of that document, rather than by the terms that Franklin wishes it had included but did not include therein, Franklin has no claim.

Franklin's argument that indentures should be construed by extrinsic evidence and not from their four corners could not be more mistaken on the law. Indentures are not like other contracts, and for the most compelling reasons:

a)    Their relevant terms are to be construed as a matter of law by the Court: Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1040 (2d Cir. 1982), cert. den., 460 U.S. 1012 (1983);

b)    The intent of the parties to an indenture is relevant only to the extent their intent is actually expressed in the indenture itself: Broad v. Rockwell Int'l Corp., 642 F.2d 929, 947 (5th Cir. 1981) (en banc), cert. den., 454 U.S. 965 (1981); and

c)    Extrinsic evidence should not be used as an interpretive aid; if the indenture is irremediably ambiguous, then the ambiguity should be resolved in favor of the shareholders who had no role in its negotiation but who agreed to be bound by its terms: Kaiser Aluminum Corp. v. Matheson, 681 A.2d 392, 398-99 (Del. 1996).

Franklin's request that the Court ignore these principles and insert for Franklin's benefit language in the Indenture that simply is not there should not be countenanced.

## FACTUAL BACKGROUND

### a) The Background and Formation of CLO II

CLO II was formed in July 2001 as an investment trust. As is typical of the formation process, Franklin, the prospective collateral manager, engaged an underwriter – in this case Merrill Lynch – and once they agreed upon a transaction, Franklin caused two related special

purpose entities (collectively, "CLO II" or the "Issuer") to be formed. Chase Dep. at p. 156:1-5, (Ex. P); Check Dep. at p. 20:14-25, (Ex. Q). These entities would then hold various securities, principally loan obligations, which Franklin would select and manage, and which would serve as collateral for payments to those who ultimately invested in debt securities issued by the CLO. Complaint ¶¶ 3, 26, (Ex. A).[2]

In July 2001, the CLO II entities entered into an indenture with a trustee (The Chase Manhattan Bank, succeeded by The Bank of New York Trust Co., NA). Complaint ¶¶ 24, 25, (Ex. A). As also is typical, the Indenture is a lengthy, largely boilerplate document. The stated redemption date of CLO II was August 28, 2013, but earlier redemptions could be called by shareholders. (Ex. G, pp. 63-64 & 140-41). Upon a redemption, all collateral was to be liquidated and the proceeds distributed in accordance with the Indenture. (Id. at § 9.1(a), p.140).

Once a CLO is formed, the underwriter ordinarily buys all of the securities of the Issuer and resells them to investors in the secondary market. See Ardini Dep. at p. 52:15-53:6, (Ex. M); Robert B. Robbins, *Fundamentals of Securities Law: Preparation of the Registration Statement*, SNO71 A.L.I.-A.B.A 237, 241- 42 (2008). These investors thereby agree to be bound by the indenture. Merrill Lynch thus sold all of its interest in CLO II in 2001 and had no further involvement in the matters in this case until 2006. Robison Dep. at pp. 149:20-152:2, (Ex. S). As Franklin was not a signatory to the Indenture – only the Issuer and Trustee were – it entered into a separate Collateral Management Agreement with the Issuer, which incorporated the terms of the Indenture relevant here. Complaint ¶¶ 1, 3, 26, (Ex. A).

---

[2]      "Complaint" refers to the complaint-in-interpleader herein, dated February 28, 2007. All cited paragraphs of the Complaint have been admitted by Franklin Advisers in the corresponding paragraphs of the Answer and Cross-Claims of Franklin Advisers, Inc., dated April 20, 2007, ("FACC"), (Ex. C).

As of 2001, CLOs were relatively new.  Raff Dep. at pp. 26:10- 27:5, (Ex. R).  Franklin was a neophyte, having been involved in only one other CLO transaction, launched in 2000 with Chase Manhattan Bank as underwriter.  Chase Dep. at p. 81:11-14, (Ex. P).  CLO II was Franklin's first transaction with the then established industry player, Merrill Lynch.  Id at 153: 24-156:5.

> b)    The Indenture:  The "Waterfall"

Most investors in CLO II were noteholders, entitled to quarterly interest payments.  But some – like Claimants – were equity holders, denominated "Preferred Shareholders."[3]  Once CLO II was operational, all Interest and Principal Proceeds flowing from the loans it held as collateral were to be distributed by the Trustee according to detailed priorities of payment plans in the Indenture.  See Indenture  § 11.1(a), (Ex. G, pp. 162-66).

These priorities of payment are typically called "waterfalls" because they set forth on a cascading basis which parties are to get paid in what order.  Thus, starting with the entire bucket of money to be distributed on a given Distribution Date, the Trustee will look at the first step in the waterfall, see how much is due to the persons there designated (for example, for taxes), and take that money out of the bucket to pay what is due.  The funds in the bucket, minus what was distributed in the first step, will then be distributed to the persons designated in the second step, and the Trustee will repeat the process until all funds are depleted.  Funds that are not otherwise

---

[3] Long after Merrill Lynch sold its original interests as underwriter, a group within Merrill Lynch different from that which worked on the underwriting – the trading desk – purchased a small amount of CLO II Preferred Shares in the secondary market in 2006. The trading desk had no involvement in or communication with the Merrill Lynch personnel responsible for the underwriting. See Robison Dep. at pp. 78:6-18; 153:6-16, (Ex. S). Merrill Lynch's involvement in this action is thus solely in its capacity as a buyer of shares in the secondary market.

distributed "pool" at the bottom of the waterfall, i.e., they go to the residual beneficiary at the last waterfall step. Id.; see Burnett Dep. at p. 27:2-23, (Ex. O).

In the CLO II Indenture, separate waterfalls governed the distribution of "Interest Proceeds", i.e., payments flowing from the interest on the underlying collateral loans, and "Principal Proceeds," i.e., proceeds derived from obligations paid at maturity or upon liquidation in connection with a redemption of CLO II. (Ex. G, pp. 162-66). As set forth below, the claims in this action derive from the liquidation of all of the collateral and as a consequence, it is just the Principal Proceeds waterfall (Indenture § 11.1(a)(ii)), that is implicated.

Unlike the Noteholders, whose payments were guaranteed and secured by the CLO II Collateral, the Preferred Shareholders took the frontline risk of any failure of CLO II's investments. Accordingly, they were designated the residual beneficiaries under the Indenture. Indenture § 11.1(a)(i)(Q) and (a)(ii)(L), (Ex. G, pp. 164, 166). All payments under the Indenture, whether of Interest or Principal Proceeds, were to be disbursed only on defined, quarterly Distribution Dates. (See Ex. G, § 1.1 "Distribution Date" Def., p. 21).

    c)    <u>The Indenture:  Franklin's Fees</u>

In addition to other compensation, Franklin received two fees that were, for all practical purposes, guaranteed during the life of CLO II.  One, the "Base Collateral Management Fee," was to be paid each quarter before even the Noteholders received any distribution. (Ex. G, §11.1(a)(i)(B), pp. 162-63).  The other, the "Subordinated Collateral Management Fee," was to be paid each quarter before any payment was made to the Preferred Shareholders. (Ex. G,

§11(a)(i)(B) & (a)(ii)(I) at pp. 162-63, 65). Franklin received in excess of $14 million in such fees during the five and a half year life of CLO II. Franklin's Reply at p. 4, fn. 6, (Ex. F). [4]

Franklin now claims that it is also entitled to an additional fee – a Contingent Collateral Management Fee ("CCMF"). This is a performance fee which the Issuer must pay to the Collateral Manager if, prior to the liquidation date, the Preferred Shareholders have received a 12% per annum internal rate of return on their investment from the inception of the CLO, and certain other enumerated criteria are met. Indenture § 1.1, CCMF Def., (Ex. G, p.16).

With respect to CLO II, all that can be said about the CCMF is that the Indenture contains such a provision. Even after full discovery, how it got there, or what was said respecting its insertion into the Indenture, remains a mystery.

As of 2001, CCMFs were not universally used in CLOs, (Check. Dep. at pp. 36:22-37:2, (Ex. Q); Raff Dep. at pp. 47:23- 48:3, (Ex. R)), and there were a number of different standard form provisions available to parties who wanted to include such a fee as a component of the manager's compensation. Compare CLO I and CLO II Indentures. (Ex. H, pp. 22-23; Ex. G, p. 16). But no party or witness was able to locate any written instruction pertinent to how the CCMF provisions in the CLO II Indenture were to be drafted. Maryann Chase, the Franklin employee primarily responsible for CLO II, testified that she did not know how the CCMF terms got conveyed to Franklin's outside counsel for inclusion in the Indenture. (Ex. P, pp. 195:22- 197:6). Neither could Franklin's counsel remember how, or even if, they did. Raff Dep. at pp. 48:17- 49:6, (Ex. R). Franklin's counsel testified that he believed the CCMF provision was

---

[4] "Franklin's Reply " refers to Franklin Advisers' Reply Memorandum of Law in Further Support of Its Motion to Dismiss the Cross-Claims of CDO Plus and Merrill Lynch, dated June 29, 2007.

taken from an earlier indenture used as a template for CLO II, but he could not say which indenture or what it said. (Ex. R, pp. 32:12-34:5; 82:14- 83:7). Deal counsel had no recollection at all in this regard. (Ex. Q, pp. 38:17-22; 158:5-159:5). Most significantly, counsel could not recall there being any discussion about or negotiation over the language of the Indenture provisions relevant to the CCMF. Neither could they recall any conversations with their clients about the CCMF or what fees would be due under the Indenture. (Ex. R, pp. 48:10-54:21; Ex. Q, p. 39: 3-12).

However it came about, the CCMF definition prescribes a calculation of a CCMF for different quarterly "Interest Accrual Periods," based on the amount of assets held by CLO II at the end of quarterly "Due Periods," with payment to be made, if appropriate, on related "Distribution Dates." The definition can only be understood by cross reference to other provisions in the Indenture, and as Claimants tried to set these forth in user-friendly fashion in their opposition to Franklin's motion to dismiss, Claimants attach as Schedule B hereto the relevant excerpt. CDO Opp. at pp. 10-14, (Ex. E).[5] What is significant for immediate purposes is that a CCMF becomes due only when the Preferred Shareholders "have received" a 12% IRR on a "Distribution Date" as defined. (Id. at 10.)

> d)    The Optional Redemption

Although CLO II was not slated to mature until 2013, on February 14, 2007, Preferred Shareholders holding more than 50% of CLO II called an Optional Redemption effective as of February 28, 2007. Complaint at ¶¶ 27, 29, (Ex. A). Pursuant to § 9.1 of the Indenture, this

---

[5] "CDO Opp." refers to the Memorandum of Law in Opposition to the Motion of Franklin Advisers, Inc. to Dismiss the Crossclaims of CDO Plus and Merrill Lynch, dated June 13, 2007.

triggered a liquidation of all of CLO II's collateral.  Complaint ¶ 35, (Ex. A); (Ex. G, pp. 140-41).

There is no dispute that prior to February 27, 2007, Franklin never approached, much less achieved, the 12% return for the Preferred Shareholders necessary to make a CCMF become due. Ardini Dep. at pp. 168:22-169:9, (Ex. M); Boyadjian Dep. at p. 31:8-13, (Ex. N).  Nevertheless, on February 26, 2007, Franklin made a claim on the Trustee for a $7.2 million CCMF.  Franklin asserted that a CCMF had become due and payable because once the Trustee distributed the last dollars derived from the liquidation all the way down the waterfall on the Redemption Date, this "balloon payment" would bring the Preferred Shareholders to a 12% IRR.  Franklin also insisted that the CCMF accrued from day one of the venture, such that it should receive the same aggregate CCMF as if it had achieved a 12% return on the Closing Date – a $7.2 million rather than a $337, 287.32 CCMF.  Franklin MTD at p.7, (Ex. D); FACC ¶¶ 77-78. (Ex. C).  Franklin did this even though under §11.1(e) of the Indenture, it was required to deliver to the Trustee a certificate for any CCMF it claimed to be payable on any Distribution Date, and on none of the twenty-two Distribution Dates prior to the Redemption Date did Franklin ever submit such a certificate to confirm its putative right to the CCMF.  See Ardini Dep. at p. 106:6-23, (Ex. M); Complaint ¶ 30, (Ex. A).

After failing to obtain clarification from Franklin on the bases for its claims, and in the face of ever shifting positions by Franklin, CDO Plus advised the Trustee that it objected to Franklin's demands.  Uderitz Dep. at pp. 165: 24- 167:7, (Ex. T).  The Trustee, in turn, commenced this interpleader action.

e)    The Instant Litigation

In response, Franklin cross-claimed seeking payment of a $7.2 million CCMF, and

Claimants cross-claimed, asserting that no such fee was due and that the monies at issue should

be paid *pro rata* to the Preferred Shareholders.  Franklin then moved to dismiss these cross-

claims pursuant to R. 12(b)(6), Fed. R. Civ. P.

In its motion, Franklin maintained that since under the Indenture an Optional Redemption

Date must be a Distribution Date (Ex. G, §1.1 Optional Redemption Date Def., p. 33), the § 11.1

waterfalls controlled the distribution of funds just as they would on any other Distribution Date.

Franklin further argued that §11.1 required a "forward looking" calculation which would give

effect to Principal Proceeds received on the Distribution Date in determining whether a CCMF

was due, so that if the last dollar paid to the Preferred Shareholders at step L of the Principal

Proceeds waterfall brought them to a 12% IRR, funds would then flow back up the waterfall to

step J to pay the CCMF to Franklin.  Franklin MTD at p. 7, (Ex. D).[6]

Claimants, conversely, asserted that no CCMF could be due or payable until the Preferred

Shareholders actually received funds bringing them to a 12% IRR.  CACC ¶¶ 60-62, (Ex. B).

Because proceeds received on any given Distribution Date would not reach the Preferred

Shareholders until after the waterfall step where the CCMF was calculated, payment of the

CCMF based on such proceeds could only be made on the next Distribution Date – hence the use

of the term "have received" a 12% IRR in the CCMF definition.  And, of course, there could be

no "next Distribution Date" after a redemption.  CDO Opp. at p. 17, (Ex. E).

---

[6] "Franklin MTD" refers to Franklin Advisers' Memorandum of Law in Support of Its Motion to Dismiss the Cross-Claims of CDO Plus and Merrill Lynch, dated May 10, 2007.

The Court found that Claimants' reading of § 11 was plausible and reasonable (and Franklin's "not unreasonable") and denied Franklin's motion to dismiss without considering the other Indenture provisions implicated by the parties' arguments. <u>Bank of New York Trust, N.A. v. Franklin Advisors, Inc.</u>, 522 F.Supp.2d 632, 637-38 (S.D.N.Y. 2007). But with the Court now enabled to consider a broader array of materials, summary judgment should – indeed must – be granted in Claimants' favor on the following grounds:

1)    Contrary to Franklin's argument, section 11.1 is <u>not</u> the operative provision. On an Optional Redemption Date, Article 9 of the Indenture entitled "Redemption of Notes" – not Article 11 – controls, and Article 9 provides that no CCMF is to be paid in the event of an Optional Redemption;

2)    Even if an Optional Redemption Date were to be treated like any other Distribution Date, Franklin's reading of § 11.1 is untenable. When § 11.1 requires proceeds to be carried back up the waterfall, it says so. It did not say so respecting the CCMF. Moreover, in 2001 there was a boilerplate indenture clause that provided for a CCMF to be computed using a calculation that gives effect to the proceeds received on a given distribution date as Franklin asks. In fact, that boilerplate language was used in Franklin CLO I, and later in Franklin CLO III (Exs. H & I). Yet in CLO II, that provision was supplanted by one which, by its plain terms, negated any such forward looking calculation (Ex. G); and

3)    Finally, if any CCMF could be awarded to Franklin, the Indenture makes clear it is limited to the amount payable for the final Due Period, i.e., that the CCMF does not accrue from the Closing Date but only from the date the Preferred Shareholders receive an IRR of 12% – a computation which would limit any CCMF payable here to approximately $337,000.

## ARGUMENT

## POINT I

### INDENTURE PROVISIONS ARE UNIFORMLY INTERPRETED BY THE COURTS AS A MATTER OF LAW

Summary judgment is uniquely appropriate here for a very simple reason. CLO II, like most structured finance vehicles, is governed by an indenture which spells out the rights of the parties in intricate detail. And summary judgment in Claimants' favor is uniquely appropriate

for an equally simple reason:  the plain language of the Indenture, construed in accordance with controlling legal principles, compels the conclusion that the funds at issue must be paid to the Preferred Shareholders and not as a CCMF to the Collateral Manager.

As shown above, the Indenture language relating to the CCMF – the only thing investors had to go on when deciding whether or not to invest – was not the subject of discussion or negotiation but was taken whole from another indenture, genesis unknown.  Raff Dep. at pp. 33:12-34:5; 48:17- 49:6; 82:14-83:7, (Ex. R).   It is therefore classic "boilerplate," and a long line of cases in the Second Circuit, starting with Sharon Steel Corp. v. Chase Manhattan Bank, N.A., make plain that under governing New York law, its interpretation is a matter of law for the Court. 691 F.2d at 1048.

There is good reason for this.  As the instant case illustrates, indenture provisions tend to be selected from templates.  They are therefore not dependent on individual negotiations or the intent of the immediate parties to a *post facto* dispute.  Further, the same language tends to be used in numerous indentures, making uniformity, i.e., interpretation as a matter of law not fact, a desirable end.  As a consequence, courts strive to avoid finding ambiguity or resorting to extrinsic evidence when interpreting such provisions.  See, e.g., Id.; Bank of New York v. Tyco Int'l Group, 545 F.Supp.2d 312, 319 (S.D.N.Y. 2008); Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 716 F.Supp. 1504, 1515 (S.D.N.Y. 1989) (rejecting evidence of industry custom as a vehicle to interpret scope of indenture language.), vacated on other grounds, 906 F.2d 884 (2d. Cir. 1990); United States Trust Co. v. Executive Life Ins. Co., 602 F. Supp. 930, 936 (S.D.N.Y. 1984) ("This case involves interpretation of indentures which is ordinarily well-suited for a motion for summary judgment."). See also, Kaiser supra.

Most centrally, it would create chaos in the market if the law were otherwise, i.e., if an investor's rights could be subject to whatever interpretation a party to an indenture wanted to claim was intended years after the fact. As the Second Circuit put it:

> Whereas participants in the capital market can adjust their affairs according to a uniform interpretation, whether it be correct or not as an initial proposition, the creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets. Such uncertainties would vastly increase the risks and, therefore, the costs of borrowing with no offsetting benefits either in the capital market or in the administration of justice. Just such uncertainties would be created if interpretation of boilerplate provisions were submitted to juries sitting in every judicial district in the nation.

Sharon, 691 F.2d at 1048; accord, e.g., Unigard Sec. Ins. Co. v. Northern River Ins. Co., 4 F.3d 1049, 1071 (2d Cir. 1993); Tyco, 545 F. Supp.2d at 319.

In light of this, courts employ specialized rules of construction in the indenture context. Thus, because indentures govern the rights of buyers in the secondary market – who were not involved in the negotiations and who have no way of ascertaining the intended meaning of the indenture except from its language – the subjective intent of the negotiating parties is not germane. For like reasons, indentures are interpreted strictly, and courts will not add to or subtract from their terms on theories of fairness or otherwise. Broad, 642 F.2d at 947 ("a court must be concerned with what the parties intended, but only to the extent that they evidence what they intended by what they wrote") (applying New York law); Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F. Supp. 976, 993 (S.D.N.Y. 1989); In re Loral Space and Commc'n Consol. Litig., No. 2808-VCS, 2008 Del. Ch. LEXIS 136, at *134 (Del Ch. Sept. 19, 2008) (indenture provisions are strictly construed under New York law); Law Debenture Trust Co. v. Petrohawk Energy Corp., No. 2422-VCS, 2007 Del. Ch. LEXIS 113, at *17 (Del. Ch. Aug. 1, 2007) (holding under New York law, "with regard to standardized agreements like the

Indenture, determination of [the parties'] expectations must be done by examining the language of the agreement itself...."), aff'd, 947 A.2d 1121 (Del. 2008).

By coupling these specialized rules with generally applicable principles of contractual interpretation, e.g., construing the document as a whole and construing conflicting provisions to give effect to each, courts have almost always been able to interpret indentures from within their four corners – witness the numerous cases cited herein where courts have granted summary judgment respecting contested indenture provisions.

What of the rare case where, even after using all of these methods, a court must nonetheless conclude an indenture provision is ambiguous?  While for many years there was much theoretical musing of what should be done in such an instance, the Delaware Supreme Court finally met and resolved that issue in Kaiser, supra.

There, the court held the proper course is not to embark on a quest through extrinsic evidence, but to invoke the rule of *contra preferentum* and interpret the ambiguity in favor of the investor, who was not involved in drafting the indenture.  Moreover, the court reached this conclusion notwithstanding the issuer's argument that the investors "stand in the shoes" of the underwriter who did participate in the drafting.  As the court explained:

> When a contract is ambiguous, a court normally relies upon extrinsic evidence of the parties' intent.  Such a course is not appropriate in this case for two reasons. First, such an investigation would reveal information about the thoughts and positions of, at most, the issuer and the underwriter.  Whether these parties can legitimately be viewed as "negotiating" indenture provisions is a subject of some dispute.
>
> *        *        *        *

Second, we are reluctant to risk disuniformity by adverting to evidence of the course of negotiation in a setting in which the same language can be found in many different contracts.

We are left then with a hopelessly ambiguous contract and a reluctance to rely upon extrinsic evidence.

   *     *     *     *

We agree that "while debtor corporations are not the actual drafters of bond contracts, they are in a much better position to clarify the meaning of… contract terms in advance of disputes than are investors generally." … Moreover, when faced with an ambiguous provision in a document such as the Certificate, the Court must construe the document to adhere to the reasonable expectations of the investors who purchased the security and thereby subjected themselves to the terms of the contract.

Kaiser, 681 A.2d at 398-99 (citations omitted).

In addition to relying heavily on New York decisional law, Kaiser is consistent with the Second Circuit's decision in Columbia Gas Sys., Inc. v. U.S., 473 F.2d 1244 (2d Cir. 1973). There, the court expressly followed the ruling in Bethlehem Steel Corp. v. U.S., 434 F.2d 1357 (Ct. Cl. 1970) which, in finding a close question of interpretation under an indenture, held that as between the issuer and the bondholders:

The preferable solution is to charge this ambiguity against [the issuer], as the one responsible for the wording of the clause and the indenture….

   *     *     *     *

The "ambiguity principle" has a special pertinence in these circumstances because of the effect of the indenture clause on the status of the converting bondholders, who, of course, had to accept the terms of the indenture as it was, being powerless to bargain over that aspect.

Id. at 1360. (emphasis supplied)  The Second Circuit called Bethlehem a decision "reflecting the equities," and one that it was "prepared to accept." Columbia Gas, 473 F.2d at 1248-49.

This is a *per force* case for application of the same rule.  Franklin's entitlement *vel non* to

a CCMF flows from the Collateral Management Agreement (the "CMA"), to which neither the

underwriter nor, of course, the Preferred Shareholders, are parties.  Check Dep. at pp. 32:22-

34:2, (Ex. Q).  If Franklin wanted to protect itself in case of an Optional Redemption, it could –

and should – have explicitly provided in the CMA what its rights were, and ensured that the

Indenture conformed.  See, e.g., Collateral Management Agreement between Franklin CLO V,

Ltd., as Issuer, and Franklin Advisers, Inc., as Collateral Manager, dated May 18, 2006, (Ex. L,

pp. 20-22).  If it did not do so, the onus properly falls on Franklin.  Columbia Gas, 473 F.2d at

1248-49; Kaiser, 681 A.2d at 399.  Moreover, once the rule of *contra preferentum* is applied, it

sounds the death knell for Franklin's claim.  Thereunder:

> [T]he only way in which [Franklin] may prevail is if the terms of the ... Indenture
> unambiguously make clear that the parties did not intend [to provide that the
> funds at issue would be paid to the Preferred Shareholders].  Anything less, even
> some level of ambiguity will result in a construction of the Trust Indenture
> favoring [the Preferred Shareholders].

Prescott, Ball & Turben v. LTV Corp., 531 F.Supp. 213, 217 (S.D.N.Y. 1981).

But this rule of last resort need not be reached.  When the Indenture is interpreted under

the applicable rules of construction, it unambiguously shows that the monies at issue should go

to the Preferred Shareholders, and that Claimants' motion should thus be granted.

### POINT II

### ARTICLE 9 OF THE INDENTURE
### CONTROLS AND DIRECTS THAT NO CCMF
### WILL BE PAID ON AN OPTIONAL REDEMPTION

Franklin's argument that it is entitled to a CCMF under Article 11 of the Indenture put

the rabbit in the hat by inviting the Court to consider the wrong question.  While Article 11

controls the distribution of proceeds during the life of the CLO, the real question is: does Article

11 control in the case of an Optional Redemption?  The answer is, it does not.

As may be seen, Article 9 is titled "Redemption of Notes" and § 9.1 thereunder

"Redemption at the Option of the Co-Issuers; Election to Redeem."  That section deals with

precisely the situation at issue here: an Optional Redemption called by a majority of the equity

holders of CLO II, i.e., where the Preferred Shareholders direct the Co-Issuer to redeem.  As may

also be seen, § 9(b) provides relevant definitional guidance, and § 9.1(e) its own plan for the

distribution of funds upon an Optional Redemption, which plan is different from the one in the §

11 waterfall. (Ex. G, pp. 140-41).

The conflict is easily resolved:  first, the specific governs the general, and Article 9 deals

specifically with Optional Redemptions rather than the more generalized provisions of Article 11

which deal with distributions in the context of an ongoing venture.  Second, Article 11 explicitly

provides that it is "subject to... Article 9...."  (Ex G, p. 162-66).  Each of these considerations

makes Article 9 controlling in these circumstances.  See Broad, 642 F.2d at 951.

As to the distribution plan on Optional Redemptions, § 9.1(e) directs:

> After payment of the Notes and the expenses of the Co-Issuers on any
> Redemption Date, the Trustee shall pay (i) first, to the Class C-2 Redemption
> Additional Interest and (ii) second to the Preferred Share Paying Agent, for
> distribution to the Holders of the Preferred Shares as liquidating distributions, all
> remaining proceeds from the sale and/or termination of the Collateral and all other
> funds in the Collection Account.

(Ex. G, p. 141).

The term "expenses of the Co-Issuers" has its definitional antecedent in § 9.1(b), which

makes clear that it refers to payments due "prior to the payment of Notes."  Accordingly, taking

- 16 -

into account the payments due Noteholders, § 9.1(e) first directs making the payments described at steps A-H of the Principal waterfall, then directs payment of a special form of redemption interest to Class C-2 Noteholders, and then skips to the bottom of the waterfall to provide for payment of all remaining amounts to the Preferred Shareholders, which occurs at step L.  (Ex. G, p. 140-41).  In other words, payments that would otherwise be made at steps I-K of the § 11 Principal Proceeds waterfall are excluded on Optional Redemptions.

Under § 11.1, the CCMF is to be paid at step J.  Thus, it is right in the cross hairs of that which is excluded by § 9.1(e).  There is no ambiguity here – § 9.1(e) disallows not only the CCMF but all other non-guaranteed compensation to the Collateral Manager on an Optional Redemption, and application of its plain terms is dispositive of and fatal to Franklin's claim.

Lest Franklin argue, as it has in the past, that this plain language of the Indenture should be disregarded as economically unsound, irrational, or the like, such an argument would be specious.  First, courts interpreting indentures are supposed to be dealing with the language of the document, not inserting economic value judgments into the document.  Purcell v. Flying Tiger Line, Inc., No. 82 Civ. 3505(CES), 1984 U.S. Dist. LEXIS 24921, at *12 (S.D.N.Y. Jan. 12, 1984).  Second, while an Optional Redemption Date must fall on a Distribution Date, it is impossible to argue seriously that they are one and the same thing.  Most obviously, the ordinary Distribution Date presupposes the CLO II venture continues and that there will be other payments dates to follow – all not true on an Optional Redemption Date.  Thus, there is no *a priori* basis to assume that the distribution plans should be the same.

In fact, the exact opposite is the case.  The CCMF is designed to incentivize performance by the Collateral Manager.  FACC ¶ 63, (Ex. C).  When a CLO terminates, there is nothing to

incentivize going forward. Thus, to award a CCMF on an Optional Redemption would be to defeat the very purpose of the fee. Moreover, an Optional Redemption may indicate dissatisfaction with the collateral manager's performance. It would hardly be unreasonable for shareholders to decide that they would not want a contingent management fee paid when, as here, it may turn out to be the equity holders' decision to liquidate, and not the manager's efforts, that results in the 12% IRR being attained.

But these hypotheses are offered only to pretermit an "irrational" type argument by Franklin. It is not important why the parties affirmatively excluded payment of a CCMF in an Optional Redemption scenario. What is important is that they did so. Broad, 642 F.2d at 955-56. New York law will not imply a term where circumstances indicate that the parties could foresee the contingency at issue and the contract can be enforced as written. In Re Loral Space, 2008 Del Ch. LEXIS 136, at * 133-34. As the court said in Hartford:

> Implying a term barring [a merger] also would require the court to add a substantive provision for which the parties did not bargain. That is especially troublesome in light of the fact that the Indenture could easily have been drafted to incorporate expressly the terms the Plaintiffs now urge this court to imply.
>
> The fact that these terms appeared nowhere in the Indenture does not mean the court now should imply them to protect the parties' bargain. In fact the opposite appears to be true. Because the risk of a takeover – and the indenture provisions available to limit that risk – were well-known, to imply such provisions could impose on the parties terms they affirmatively excluded from their contract.

723 F.Supp. at 992.

Accordingly, Claimants' motion for summary judgment should be granted.

## POINT III

### EVEN UNDER ARTICLE 11,
### NO CCMF CAN BE DUE

Assuming that § 11.1 governs, the Court would have to resolve on the summary judgment record whether a CCMF should be paid if a 12% IRR is first achieved by application of the proceeds received on the final Distribution Date. The answer, once again, is "no."

On its motion to dismiss, Franklin argued that it was entitled to a CCMF because the definitional provision of CCMF directed that all proceeds collected "through" a relevant Distribution Date had to be included in determining if the 12% IRR was met; and since the Preferred Shareholders "would receive" a 12% IRR once the proceeds from the liquidation were distributed down the Principal Proceeds waterfall to step L, this condition would be satisfied. (Ex. D, p. 7). But Franklin omitted something. Under the CCMF definition, proceeds received "through" a given Distribution Date may be counted in determining whether the Preferred Shareholders have received a 12% IRR on that date, but this would entitle Franklin to a payment of a CCMF only on the next Distribution Date. (Ex. G, p. 16).

This is true because when funds are received they must be distributed to the bottom of the relevant waterfall before the Preferred Shareholders' rate of return can be computed. On the liquidation date, if the proceeds derived from the liquidation of collateral flow down to step J – the CCMF provision – the Preferred Shareholders still will not have received a 12% IRR; that would only happen when the funds continued down to step L. However, once the funds passed through step J and pooled at step L, they could not then be pushed back up the waterfall to pay the Collateral Manager absent a specific direction in the Indenture. Rather, the CCMF would

accrue and – per the explicit language of the Indenture – be paid "in arrears" on the next Distribution Date. (Ex. G, §1.1 CCMF Def., p. 16).

This system works seamlessly except when someone tries to force the square peg of the § 11 waterfall into the round hole of an Optional Redemption where there is no next Distribution Date, and thus no date on which payment of a CCMF can be made. That is one reason why Franklin's argument simply does not work. An Optional Redemption Date cannot be treated just like any other Distribution Date, and the Indenture only makes sense when Article 9, not Article 11, is applied to distributions on that date.

Further, Franklin's argument that § 11 contemplated a "forward looking" calculation that would give effect to proceeds received on the Distribution Date (Franklin MTD at p. 7, (Ex. D)) is a concept found nowhere in the language of § 11.1. That omission is all the more telling because in the rare and counter-intuitive instance when proceeds are intended to flow back up the waterfall, the Indenture says so explicitly. E.g., Indenture § 11.1(a)(ii)(H), (Ex. G, p. 165). As may be seen, it does not say that in the Principal Proceeds waterfall at step J.

All of this provides at least four more reasons why Article 9, and not Article 11, should be deemed to govern here: first, indenture provisions should be read to harmonize when possible, Broad, 642 F.2d at 947; second, the Court should not indulge a reading of Article 11 that makes the distribution plan of § 9.1 a nullity, Hartford, 721 F.Supp. at 992; third, courts should not engraft language into indentures that the parties did not put there, Id. at 991-92; and strike four, the fact that the Indenture shows the drafters knew how to include something specifically when they wanted to makes clear that the omission was advertent and controlling. Purcell, 1984 U.S. Dist. LEXIS 24921, at *10.

While the Indenture can thus be construed within its four corners as rejecting Franklin's claim, it should be noted that when Franklin wanted a CCMF to be calculated by taking into account the proceeds received on a given Distribution Date, it said that explicitly as well. Thus, in its initial foray with Chase Manhattan in 2000, Franklin utilized a very different indenture definition for the CCMF equivalent, an "Incentive Management Fee:"

> A fee of 0.25% per annum payable in an amount calculated under the Incentive Management Fee Calculation if on any Distribution Date the holders of the Class E Notes have received an Internal Rate of Return of 12.0% on the original principal amount of the Class E Notes for the period from the Closing Date to such Distribution Date (after taking into account any distributions made or to be made on the Class E Notes on such Distribution Date and all prior Distribution Dates in accordance with the Priority of Payments).

CLO I Indenture, (Ex. H, p. 22) (emphasis supplied.).[7]

After Franklin and Chase Manhattan parted ways, Franklin and Merrill Lynch adopted the very different provision found in the CLO II Indenture, which, as may be seen, affirmatively excludes the phrase "after taking into account any distributions made or to be made... on such Distribution Date... ." Only on their second deal, when presumably the parties had a greater comfort level, did they agree to include like language in the CCMF definition. See CLO III Indenture, (Ex. I, p. 16). When parties to a contract change operative language, it must be assumed that they did so for a purpose, and a construction should not be adopted which renders that language meaningless. Loughman v. Unum Provident Corp., 536 F.Supp.2d 371, 376 (S.D.N.Y. 2008); Gruppo, Levy & Co. v. ICOM Information & Commc'n Inc., No. 01 Civ. 8922 JFK, 2003 WL 21511943, at *6 (S.D.N.Y. July 1, 2003).

---

[7] In the CLO I Indenture, an incentive fee was payable in two tranches depending on the rate of return to the Class E noteholders, as the residual beneficiaries were there denominated. CLO I Indenture at p. 22, (Ex. H).

Even more importantly, the provisions in CLO I and CLO III show that "[T]he Indenture could easily have been drafted to incorporate expressly the terms [that Franklin] now urge[s] this court to imply." Hartford, 723 F.Supp. at 992. This fact is all the more significant for summary judgment purposes here, since, i) an alternative boilerplate provision actually existed in 2001 that would have achieved the result Franklin urges, and, ii) Franklin previously negotiated CLO indentures including precisely such a provision. See United Health Group, Inc., v. Wilmington Trust Co., 548 F.3d 1124, 1129 (8th Cir. 2008); Finisar Corp. v. US Bank Trust Nat'l Ass'n, No. C 07- 4052 JF (PVT), 2008 US Dist LEXIS 65329 *16, n.4 (N.D. Calif. Aug. 25, 2008) (both applying New York law). But most importantly, because it failed to have the Indenture so drafted, the consequence of any ambiguity thereby created rightly falls upon Franklin, not upon the investors. Columbia Gas, 473 F.2d at 1248-49; Kaiser, 681 A.2d at 398.

In sum, Franklin is asking the Court to disregard the "have received" and "in arrears" language in the Indenture; to insert a clause "taking into account any distributions made or to be made on the Distribution Date" that nowhere appears in the Indenture; to assume that the change in locution from CLO I was meaningless; and to resolve any ambiguity against parties who played no part in negotiating the indenture but simply agreed to be bound by it.

This violates too many rules of contractual construction to be calculated. Franklin's arguments should be rejected and summary judgment granted in Claimants' favor.

## POINT IV

### A CCMF WOULD ONLY ACCRUE WHEN DUE AND PAYABLE, NOT FROM DAY ONE OF THE CLO II VENTURE

Franklin bases its claim for a $7.2 million CCMF on a theory that the CCMF was intended to accrue from day one of CLO II, i.e., it would begin to accrue long before it became

due or payable. To the contrary, the Indenture states that when a CCMF becomes due by reason of a 12% IRR having been achieved, it can only be paid if adequate, unencumbered funds are available; and, if it cannot be paid when due, only then will the fee accrue and be paid on subsequent Distribution Dates when funds are available. Thus, there is no provision for accrual unless, as of a Distribution Date, a CCMF was actually payable, and under the Indenture, a CCMF cannot be payable unless the 12% IRR has already been achieved. (Ex. G, pp. 26-27).

Franklin's effort to engraft language into the Indenture that could have been included but just is not there rings especially hollow, because when a fee is to accrue whether or not it is payable, the Indenture says so in explicit terms. Thus, the definition of the Subordinated Collateral Management Fee contains the following express direction as its last sentence. **"The Subordinated Collateral Management Fee will accrue from the Closing Date whether or not currently payable."** (Ex. G, p. 53-54) (emphasis supplied). The absence of a similar provision in the CCMF definition provides conclusive evidence that no such accrual was intended under the doctrine of "*expressio unius est exclusio alterius*." Segen v. Westcliff Capital Mgmt., LLC, 299 F.Supp.2d 262, 271 (S.D.N.Y. 2004); Purcell, supra, 1984 U.S. Dist. LEXIS 24921 at *10 (citing express exclusion in other provisions in indenture as showing the drafters did not intend exclusion in provision at issue; summary judgment granted.) That is, or should be, dispositive of Franklin's claim. Hartford, supra, 721 F. Supp. at 992.

Further, while documents antedating the Indenture cannot be used to create obligations not there provided, Broad, 642 F.2d at 947, if the Court were to accept Franklin's invitation to consider such documents – which it should not – these documents would also expose another fatal flaw in Franklin's argument.

Thus, Franklin may have wanted both a Subordinated Management Fee and a CCMF that accrued from the Closing Date, but in June 2001, Merrill Lynch prepared a preliminary analysis of the transaction (Ex. U), the type of document Franklin routinely received.  Chase Dep. at p. 316:5 -319:8, (Ex. P). It set out a proposed "waterfall" pursuant to which neither fee would accrue from closing, but only after they became "due and payable."  (Ex. U, at p. 9, § (I) & (J)).

Thereafter, on July 20, 2001, an Offering Memorandum prepared jointly by Merrill Lynch and Franklin was issued.  It was incomplete and widely inconsistent.  Its waterfall provision tracked the Merrill Lynch analysis providing for payments of both fees only when "due," thereby rejecting any accrual from day one.  (Ex. J, pp. 3, 7).  Conversely, in its description of the CCMF, the Offering Memorandum embodied language arguably consistent with Franklin's claim, stating that the CCMF "will accrue for each Due Period (whether or not payable on the related Distribution Date.)" (Id. at 88.)  But there was no such "accrue whether or not payable" language in the description of the Subordinated Management Fee, logically (and linguistically) meaning it would not so accrue.  (Id.)

The Indenture reconciled these anomalies.  Specifically, it added the clause quoted above in the definition of the Subordinated Management Fee, making clear that, notwithstanding the otherwise inconsistent language in the Indenture waterfall, the fee would accrue from the Closing Date, i.e. whether or not it was currently payable.  However, the proviso in the Offering Memorandum that the CCMF would accrue "for each Due Period (whether or not payable on the related Distribution Date)…" was deleted; no provision comparable to the last clause in the definition of the Subordinated Management Fee was added, and the Indenture kept intact the language in the Principal Proceeds waterfall providing for payment only of CCMFs that were due and unpaid.  (Ex. G, §11.1(a)(ii)(J), p.166; Ex. J, p.88).  In other words, the Indenture

reflects a compromise whereby the Subordinated Management Fee would accrue from the Closing Date but the CCMF would accrue only when earned; and the language used could not more affirmatively eschew accrual for the CCMF prior to the 12% IRR's being attained.

But once again, Franklin could have removed any doubts by including express, unambiguous accrual language in the CCMF definition.  It did not do so, and are the investors who bought pursuant to the Indenture (often years later) to be charged with surmising that this was sloppy proofreading on Franklin's part?  No, "particularly when alternative formulations indicate that these provisions could easily have been made clear." Kaiser, 681 A.2d at 399.

Accordingly, at a minimum, summary judgment should be entered limiting any CCMF to the amount which accrued on and after the Optional Redemption Date, i.e., $337,287.32.

## CONCLUSION

For the foregoing reasons, Claimants' motion for summary judgment should be granted.

Dated: April 7, 2009
       New York, New York

REED SMITH LLP

By:_____
     Lance Gotthoffer (LG 5932)
     James C. McCarroll (JM 2758)
     599 Lexington Avenue
     New York, New York 10022
     Tel. (212) 521-5400
     Fax. (212) 521-5450

     *Attorneys for CDO Plus Master Fund,*
     *Ltd. and Merrill Lynch, Pierce,*
     *Fenner & Smith Inc.*