UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------- X
THE BANK OF NEW YORK TRUST,          :
N.A., AS TRUSTEE                     :
                                     :
                Plaintiff,           :    07 Civ. 1746
                                     :
        - against -                  :    **DECISION AND ORDER**
                                     :
FRANKLIN ADVISERS, INC.,             :
et al.,                              :
                                     :
                Defendants.          :
----------------------------- X

**VICTOR MARRERO, United States District Judge.**

In this interpleader action, two investors, CDO Plus Master Fund, Ltd. ("CDO Plus") and Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") (collectively, the "Claimants"), and Franklin Advisers, Inc. ("Franklin Advisers"), all interpleader defendants, assert competing claims to funds held by interpleader plaintiff The Bank of New York ("BNY" or "Trustee"). BNY holds the funds pursuant to its role as indenture Trustee of a collateralized loan obligation ("CLO"), known as CLO II, comprised of various debt obligations which are pledged as collateral for the investors' benefit. Franklin Advisers asserts that it is entitled to a contingent collateral management fee ("CCMF") based on its role as collateral manager for CLO II. The Claimants assert that Franklin Advisers is not entitled to the fee and that the funds should instead be distributed to shareholders of CLO II. In response to the dispute, the Trustee filed the instant interpleader action pursuant to 28 U.S.C. §

-1-

1335(a), alleging that it is a neutral stakeholder, and deposited $28,249,181.73 with the Registry of the Court.

By Order dated October 9, 2007, the Court discharged the Trustee, and by Decision and Order dated November 15, 2007, the Court denied Franklin Advisers' motion to dismiss the Claimants' cross-claim.[1]   The parties have now filed cross-motions for summary judgment.   For the reasons stated below, Franklin Advisers' cross-motion for summary judgment is GRANTED in part and DENIED in part, and the Claimants' cross-motion for summary judgment is DENIED.

## I.   BACKGROUND[2]

A.   The Collateralized Loan Obligation

1.   Basic Structure

This action has its genesis in CLO II, a CLO which closed on July 26, 2001.   In early 2001, Franklin Advisers, as prospective collateral manager for CLO II, engaged Merrill

---

[1]  The Decision and Order is available at Bank of New York Trust, N.A. v. Franklin Advisors, Inc., 522 F. Supp. 2d 632 (S.D.N.Y. 2007).

[2]  The factual summary that follows is based primarily on the following documents, and any exhibits or declarations submitted therewith: the Interpleader Complaint filed by BNY, dated February 28, 2007; Claimants' Answer and Cross-claims, dated April 20, 2007; Franklin Advisers' Answer and Cross-claims, dated April 20, 2007; Claimants' Statement of Material Facts in Support of Motion by Interpleader Defendants/Cross-Claimants CDO Plus and Merrill Lynch for Summary Judgment, dated April 7, 2009 (the "Claimants' Stmt."); Local Rule 56.1 Statement of Franklin Advisers dated April 7, 2009 ("Franklin Advisers' Stmt."); Counterstatement of Material Facts Pursuant to Local Rule 56.1 in Opposition to Franklin Advisers' Motion for Summary Judgment, dated  May 28, 2009;  Franklin Advisers' Response to Interpleader Defendants/Cross-Claimants CDO Plus and Merrill Lynch's Statement of Material Facts Pursuant to Local Rule 56.1(b), dated May 28, 2009.  Except where specifically referenced, no further citation to these sources will be made.

Lynch as underwriter for the transaction that ultimately became CLO II.  Franklin then formed two related special purpose entities (which have no economic stake in the transaction), Franklin CLO II, Ltd. (the "Issuer") and Franklin CLO II, Corp. (the "Co-Issuer") (collectively, the "Issuers") to house the collateral loans and issue the CLO II securities.  The indenture among the Issuers and BNY, dated July 26, 2001 (the "Indenture"),[3] and the Collateral Management Agreement between the Issuer and Franklin Advisers, dated July 26, 2001 (the "CMA"), set forth the rights and obligations of the parties to CLO II.

Once CLO II was formed, investors could purchase two types of securities: (1) notes representing CLO II's debt divided into different levels of risk, or (2) shares of CLO II's equity ("Preferred Shares").  Initially, Merrill Lynch, as the underwriter, bought all of the securities issued by the Issuer and resold them to investors in the secondary market. In 2006, the Claimants purchased CLO securities from a third party in the secondary market and became substantial holders

---

[3] The original parties to the Indenture were the Issuer, the Co-Issuer and The Chase Manhattan Bank as trustee.  (See Affidavit of Lance Gotthoffer in Support of Motion by Interpleader Defendants/Cross-Claimants CDO Plus and Merrill Lynch for Summary Judgment, dated April 7, 2009 ("Gotthoffer Affidavit"), Ex. G.) BNY is the successor to The Chase Manhattan Bank as a result of BNY's purchase of the corporate trust business of JP Morgan Chase Bank, N.A., effective October 1, 2006.

of Preferred Shares and Class C-2 Notes.[4]

    2.   <u>Distribution of CLO II Proceeds</u>

Under the Indenture, the Trustee is responsible for receiving principal and interest payments on the underlying collateral loans, paying fees and expenses, and distributing proceeds to CLO II investors. All proceeds from the collateral loans are to be distributed by the Trustee according to two sets of detailed priorities of payments (the "Waterfalls") on defined, quarterly distribution dates ("Distribution Dates"). One of the two Waterfalls governs the distribution of interest proceeds -- payments flowing from the interest on the underlying collateral loans (the "Interest Waterfall") -- and the other governs the distribution of principal proceeds -- proceeds derived from obligations paid at maturity or upon liquidation of the CLO (the "Principal Waterfall"). The Waterfalls are structured to pay certain expenses and fees of the CLO first, and then to distribute payments to noteholders and shareholders. Equity holders in CLO II ("Preferred Shareholders") are last in the priority of payment of both interest and principal proceeds. Unlike noteholders, whose payments are guaranteed and secured by the

---

[4]  Class C-2 Notes are defined by the Indenture as "Senior Secured Participating Notes due 2013, having the applicable Class C-2 Note Interest Rate and Stated Maturity as set forth [in the Indenture]." (Declaration of Matthew A. Katz in Support of Franklin Advisers' Motion for Summary Judgment, dated April 7, 2009 ("Katz Decl."), Ex. 1 at 12.)

collateral of CLO II, the Preferred Shareholders assume the primary risk of CLO II's investments, and thus receive only the residual amount of funds after noteholders and expenses are paid.

CLO II was structured to reach maturity on August 28, 2013.  But CLO II also provides a majority of Preferred Shareholders the option to direct Franklin Advisers to sell the collateral, pay the expenses and redeem the notes before the ultimate maturity date ("Optional Redemption").  Under the Indenture, distribution of proceeds upon an Optional Redemption (the "Redemption Date") can only occur on the subsequent Distribution Date.

    3.   Collateral Management Fees

Pursuant to the CMA, Franklin Advisers is entitled to certain fees defined in the Indenture.  The Base Collateral Management Fee is to be paid on each Distribution Date before the noteholders received any distribution.  The Subordinated Collateral Management Fee (the "SCMF") was to be paid on each Distribution Date before any payment is made to Preferred Shareholders.

The fee at the heart of the instant dispute is the CCMF. The Indenture provides a detailed description of the calculation to determine whether a CCMF is to be paid to Franklin Advisers, and if so, for what amount.  Payment of the

-5-

fee is contingent on "the holders of the Preferred Shares hav[ing] received an internal rate of return of 12% per annum ... on the amount of the initial purchase price of the Preferred Shares for the period from the Closing Date through such Distribution Date" (the "IRR Hurdle"). (Claimants' Stmt. at 10 (<u>quoting</u> the Indenture); Franklin Advisers' Stmt. at 13 (same).)  When the contingency is met, calculation of a CCMF is based on the lesser of the "accrued and unpaid CCMF, consisting of the CCMF accrued for the related Interest Accrual period and any such fee accrued for prior Due Periods but not paid on any prior Distribution Date" and 40% of interest or principal proceeds "available and permitted to be used for such purpose in accordance with [the Waterfalls]" minus the amount necessary to provide an internal rate of return of 12% to the Preferred Shareholders. (Claimants' Stmt. at 10-11 (<u>quoting</u> the Indenture); Franklin Advisers' Stmt. at 13-14 (same).)

B.   <u>Competing Theories of Entitlement to the Interpleader Funds</u>

In January of 2007, a majority of the Preferred Shareholders directed the Issuers to exercise an Optional Redemption pursuant to § 9.1(a) of the Indenture.  As provided by the Indenture, the effective date for the Optional Redemption became the subsequent Distribution Date, February 28, 2007.  Consistent with its managerial duties, Franklin

-6-

Advisers liquidated the collateral by auction on February 7, 2007. Upon the Optional Redemption, Franklin Advisers submitted a claim to the Trustee for a $7.2 million CCMF, payable as of February 28, 2007. When CDO Plus, one of the Claimants, learned of Franklin Advisers' claim for a CCMF, it notified the Trustee and Franklin Advisers of its position that Franklin Advisers was not entitled to any CCMF. After a series of exchanges between the Trustee, the Claimants and Franklin Advisers, the Trustee filed the instant interpleader action.

Franklin Advisers asserts that it is entitled to a CCMF based on the payments made to the Preferred Shareholders on the Redemption Date. Franklin Advisers argues that the Indenture provides for the payment of a CCMF upon an Optional Redemption; that determination of whether the IRR Hurdle is met includes payments made to the Preferred Shareholders on the Redemption Date; and that the CCMF to be paid accrues from the closing date of CLO II.

Conversely, Claimants assert that a CCMF is not to be paid upon an Optional Redemption; that, even if a CCMF can be paid upon an Optional Redemption, the determination of whether the IRR Hurdle has been met does not include payments to the Preferred Shareholders on the Redemption Date; and, even if an Optional Redemption can trigger the IRR Hurdle, the CCMF does

-7-

not accrue from the closing date, but rather accrues only when the IRR Hurdle has been met.

## II.  <u>LEGAL STANDARD</u>

A.  <u>STANDARD OF REVIEW</u>

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986).  "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law."  <u>Rodriguez v. City of New York</u>, 72 F.3d 1051, 1060-61 (2d Cir. 1995).  A fact is material if it "might affect the outcome of the suit under the governing law."  <u>Anderson</u>, 477 U.S. at 248.  A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  <u>Id.</u> at 258.  The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party."  <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir. 1986).  When deciding cross-motions for summary judgment, the standard to be applied "is the same as

-8-

that for individual summary judgment motions and a court must consider each motion independent of the other."  Schultz v. Stoner, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2003) (citations and quotations omitted).

B.   CONTRACT INTERPRETATION UNDER NEW YORK LAW[5]

Under New York law, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent ....  A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  Greenfield v. Phillies Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002) (citations and quotations omitted).  "Where ... the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence."  Rainbow v. Swisher, 527 N.E.2d 258, 259 (N.Y. 1988).  But "if the court finds that the terms or the inferences readily drawn from the terms[] are ambiguous, then the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract."  British Int'l Ins. Co. v. Seguros La Republica, S.A., 342 F.3d 78, 82 (2d Cir. 2002) (applying New York law) (citations and quotations

---

[5]  The relevant transaction documents in this case are governed by New York law.  (See Katz Decl., Ex. 1 (Indenture) § 14.11; Ex. 2 (CMA) § 22.)

-9-

omitted).

"Contractual language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp., 22 F.3d 458, 461 (2d Cir. 1994). A contract is ambiguous if its terms are "susceptible to more than one reasonable interpretation." Evans v. Famous Music Corp., 807 N.E.2d 869, 872 (N.Y. 2004); see also British Int'l, 342 F.3d at 82 (defining ambiguity as existing where a contract "suggest[s] more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.") (citations and quotations omitted).

In reviewing parties' competing interpretations of a contract's language, courts "need not determine which is the more likely interpretation," but rather "merely decide whether [each] ... is sufficiently reasonable to render the clause ambiguous." Mellon Bank, N.A. v. United Bank Corp., 31 F.3d 113, 115 (2d Cir. 1994) (citations and quotations omitted) (finding that given two conflicting reasonable

-10-

interpretations, the contract's language was ambiguous).

Further, under New York law, a contract "should be construed so as to give full meaning and effect to all of its provisions." LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (citations and quotations omitted). "[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible .... Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) (citations and quotations omitted); see also Columbus Park Corp. v. Dep't of Hous. Pres. & Dev., 598 N.E.2d 702, 708 (N.Y. 1992) ("[A] construction which makes a contract provision meaningless is contrary to basic principles of contract interpretation").

In a contract dispute, a motion for summary judgment may be granted if "the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008) (internal citations omitted). "To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted

-11-

only if ... there is no extrinsic evidence that would support a resolution of the ambiguities in favor of the nonmoving party's case." Id. (internal citations omitted).

### III. DISCUSSION

As described above, the Claimants and Franklin Advisers present divergent accounts of whether a CCMF should be distributed. Specifically, the parties disagree about three issues: (1) whether a CCMF can be paid under the Indenture upon an Optional Redemption; (2) if a CCMF can be paid upon an Optional Redemption, whether the Redemption Date distribution payments are to be included in determining whether the IRR Hurdle has been met; and (3) whether the CCMF accrues from the closing date or only from when the IRR Hurdle is met.

A. The Controlling Distribution Plan for an Optional Redemption

Article 9 of the Indenture, entitled "Redemption of Notes," applies to an Optional Redemption called by a majority of Preferred Shareholders. Claimants argue that Article 9 wholly controls the distribution of payments upon an Optional Redemption and does not provide for the payment of any CCMF. (See Memorandum of Law in Support of Motion By Interpleader Defendants/Cross-Claimants CDO Plus and Merrill Lynch for Summary Judgment, dated April 7, 2009 ("Claimants' Memo"), at 15-18.) Claimants contend that § 9.1(e) provides its own distribution plan, which trumps the Article 11 Waterfalls upon

-12-

an Optional Redemption.  (See id.)  Article 9.1(e) provides,

in its entirety,

> After payment of the Notes and the expenses of the Co-
> Issuers on any Redemption Date, the Trustee shall pay (i)
> first, to the Class C-2 Redemption Additional Interest
> and (ii) second to the Preferred Share Paying Agent, for
> distribution to the Holders of the Preferred Shares as
> liquidating distributions, all remaining proceeds from
> the sale and/or termination of the Collateral and all
> other funds in the Collection Account.

(Gotthoffer Affidavit, Ex. G at 141.)   However, the Court

finds that the Indenture unambiguously provides that Articles

9 and 11 are to be read together, and finds that the

Claimants' proffered interpretation fails to give a reasonable

and effective meaning to both Articles.

First, § 9.1(b) plainly indicates that Article 9 and

Article 11 are to be read together.  Section 9.1(b) provides,

> The Notes shall not be optionally redeemed pursuant to
> clause (a) unless ... the Collateral Manager on behalf of
> the Issuer has entered into a binding agreement or
> agreements with a financial institution ... for such
> financial institution to purchase ... all or part of the
> Collateral Obligations at a purchase price at least equal
> to an amount sufficient, together with the Eligible
> Investments maturing on or prior to the scheduled
> Redemption Date, to pay all administrative and other fees
> and expenses payable under the Priority of Payments prior
> to the payment of the Notes ....

(Id., Ex. G at 140.)  The Article 11 Waterfalls are defined as

the "Priority of Payments,"  (see id., Ex. G at 162,) and thus

the term "Priority of Payments" in § 9.1(b) is a clear

reference to Article 11.

Further, to construe the Indenture to give a reasonable

-13-

and effective meaning to all its terms precludes a finding that § 9.1(e) constitutes the entire distribution plan for an Optional Redemption.  The Second Circuit has held that contract interpretation "that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." Galli, 973 F.2d at 149.  Even if there was no reference to Article 11 in Article 9, without the Article 11 Waterfalls, Article 9 provides no guidance on how, or in what order, the Trustee is to pay the noteholders in the event of an Optional Redemption. Considering the detailed priority of payments provided by the Article 11 Waterfalls, it would be unreasonable to  construe § 9.1(e)'s one sentence of distribution instructions as replacing the Waterfalls for an Optional Redemption.

Claimants further contend that Article 11 "explicitly provides that it is 'subject to' ... Article 9." (Claimants' Memo at 16.)  Article 11, entitled "Application of Monies," provides,

> Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section, Article 9, and Section 13.1, on or, with respect to amounts referred to in Section 11.1(d)... the Trustee shall disburse amounts ... as follows and for application by the Trustee in accordance with the following priorities (the "Priority of Payments").

(Gotthoffer Affidavit, Ex. G at 162.)  Despite Claimants' contention that the "subject to" language indicates that the

Waterfalls are trumped by Article 9 for the purposes of an Optional Redemption, the plain meaning of the entire phrase does not support Claimants' position.  The "subject to" limitation only applies "with respect to amounts referred to in Section 11.1(d)."[6]  Accordingly, the Court finds that Article 9, read in conjunction with Article 11, plainly indicates that Article 11 generally controls the distribution of proceeds upon an Optional Redemption.

Claimants further contend that § 9.1(e)'s reference only to "expenses" precludes a finding that the Trustee can pay a CCMF upon an Optional Redemption.[7]  (Claimants' Memo at 16-17.)  Claimants contend that the term "expenses" refers only to expenses to be paid "prior to the payment of Notes" under the Waterfalls, as provided by § 9.1(b), and not to the CCMF, which, pursuant to the Waterfalls, is a fee (and not an expense) payable after the payment of notes.  The Court disagrees.  The Court finds that the plain purpose of § 9.1(b)

---

[6]  Article 11.1(d) provides,

> In connection with the application of funds to pay Administrative Expenses of the Issuer or the Co-Issuer, as the case may be, in accordance with the Priority of Payments, and in connection with the payment of amounts owing on any Global Notes, on the Class C Notes and to the Preferred Share Paying Agent for distribution to Holders of the Preferred Shares, the Trustee shall remit such funds, to the extent available, to the Issuer or the Co-Issuer, as the case may be, no later than the Business Day prior to each Distribution Date. (Gotthoffer Affidavit, Ex. G at 166.)

[7]  Section 9.1(e) provides, in relevant part, "[a]fter payment of the Notes and the expenses of the Co-Issuers on any Redemption Date." (Id., Ex. G at 141.)

-15-

is to define the conditions precedent to an Optional Redemption. Pursuant to § 9.1(b), an Optional Redemption cannot be called unless, among other things, there are enough available funds to pay all of the fees and expenses payable under the Waterfalls prior to the payment of the notes. Section 9.1(b) begins, "The Notes shall not be optionally redeemed pursuant to clause (a) unless ..." and continues to provide conditions for the permissible calling of an Optional Redemption. Accordingly, § 9.1(b) can only be reasonably read to except the CCMF insofar as the availability of funds for payment of the CCMF is not a condition precedent to the calling of an Optional Redemption.

Further, upon review of the Indenture and the CMA, it is clear that the terms "fees" and "expenses" are used interchangeably. Thus, § 9.1(e)'s omission of "fees" cannot be reasonably read to excise the CCMF from the Article 11 Waterfalls. For example, "Administrative Expenses" are defined to comprise, among other things, payment to "any other Person in respect of any other <u>fees</u> <u>or</u> <u>expenses</u> permitted under this Indenture (including the payment of assignment fees and all legal and other fees and expenses required ....)" (Gotthoffer Affidavit, Ex. G at 3 (emphasis added).) In addition, § 8 of the CMA provides, "the Collateral Manager shall be responsible for the costs and expenses (including the

fees and disbursements of counsel and accountants)." (Id., Ex. 2 at 10.)

Claimants' proffered interpretation of § 9.1(e) also proves too much. According to the Claimants' interpretation, § 9.1(e) "first directs making the payments described at steps A-H of the Principal [W]aterfall, then directs payment of a special form of redemption interest to Class C-2 Noteholders, and then skips to the bottom of the [W]aterfall .... In other words, payments that would otherwise be made at steps I-K of the [Waterfall] are excluded on Optional Redemptions." (Claimants' Memo at 17.)   Thus, according to the Claimants, the SCMF –- step I of the Principal Waterfall –- is also never payable under an Optional Redemption. But, as indicated by Franklin Advisers, the Claimants have never previously objected to payment of the SCMF, which was excluded from the interpled funds and distributed by the Trustee to Franklin Advisers on February 28, 2007. (Franklin Advisers' Memorandum of Law in Opposition to Claimants' Motion for Summary Judgment, dated May 28, 2009 ("Franklin Opp. Memo"), at 19.) "The parties interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent." Ocean Transp. Line, Inc. v. American Philippine Fiber Indus., 743 F.2d 85, 91 (2d Cir. 1984).

The Court finds that the plain purpose of § 9.1(e) is not

to serve as an alternative distribution plan to the Article 11 Waterfalls, but rather to provide for a specific class of payment: the "Class C-2 Redemption Additional Interest." Under the Indenture, Class C-2 Redemption Additional Interest is a class of payment to be paid only upon an Optional Redemption, and thus is not provided for in the Article 11 Waterfalls.[8]

For these reasons, the Court concludes that the Indenture unambiguously indicates that Article 11, subject to the additional instructions provided in Article 9, provides the distribution plan for payments upon an Optional Redemption. Accordingly, Franklin Advisers' motion for summary judgment as to this issue is granted and Claimants' motion is denied.

B.   The Calculation of the IRR Hurdle

Having determined that a CCMF can be paid upon an Optional Redemption, the Court must next address whether Redemption Date distributions to Preferred Shareholders are to be included in determining whether the IRR Hurdle has been met.  The Indenture defines the CCMF, in pertinent part, as:

> The fee payable for each Interest Accrual period to the Collateral Manager in arrears on each Distribution Date pursuant to Section 8 of the [CMA] and Section 11.1

---

[8]   Section 1.1 provides that "Class C-2 Redemption Additional Interest: Means, on any Redemption Date, an amount equal to the product of (i) the Class C-2 Yield Percentage and (ii) the amount of Principal Proceeds available on such Distribution Date after giving effect to payments required pursuant to clauses (A) through (J) of Section 11.(a)(ii) on such Distribution Date."  (Id., Ex. G at 12.)

> hereof ...; <u>provided</u>, <u>however</u>, that the [CCMF] will be payable on each Distribution Date only to the extent that (i) the holders of the Preferred Shares have received an internal rate of return of 12% per annum ... on the amount of the initial purchase price of the Preferred Shares for the period from the Closing Date through such Distribution Date ....

(Gotthoffer Affidavit, Ex. G at 16 (emphasis in original).) The parties agree that the CCMF will be payable to Franklin Advisers if the Preferred Shareholders have met the IRR Hurdle. But the parties disagree as to whether the final distribution payments upon an Optional Redemption are to be included in the calculation.

The Court has previously found that the Indenture language as to this issue is ambiguous. <u>See</u> <u>Bank of N.Y. Trust</u>, 522 F. Supp. 2d at 636. "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." <u>W.W.W. Assocs., Inc. v. Giancontieri et al.</u>, 566 N.E.2d 639, 642 (N.Y. 1990). But even where the Court finds contract language ambiguous, the Court may still examine extrinsic evidence provided on the record "and, if that evidence is, as a matter of law, dispositive of the interpretive issue, grant summary judgment on that basis." <u>Comprehensive Habilitation Servs., Inc. v. Commerce Funding Corp.</u>, No. 05 Civ. 9640, 2009 WL 935665, at *12 (S.D.N.Y. Apr. 7, 2009). "Where extrinsic evidence provided on the record leaves genuine issues of material fact in interpreting the contract, summary judgment

-19-

is inappropriate." Id.  Summary judgment may be granted only if "there is no extrinsic evidence that would support a resolution of the ambiguities in favor of the nonmoving party's case." Topps, 526 F.3d at 68.

  1.  Evidence of Parties' Intent

    Franklin Advisers argues that the parties intended, and the Indenture provides, that the final distributions to the Preferred Shareholders are to be included in determining whether the IRR Hurdle has been met. (See Franklin Advisers Opp. Memo at 20.)  Franklin asserts that the plain language of the Indenture, bolstered by extrinsic evidence, demonstrates that the phrase "through such Distribution Date" means "through and including such Distribution Date." (See Franklin Advisers' Memorandum of Law in Support of its Motion for Summary Judgment, dated April 7, 2009 ("Franklin Advisers' Memo"), at 14-19.)  Under Franklin Advisers' calculations, the Preferred Shareholders will have received a cumulative internal rate of return exceeding 12% when the last distribution of the liquidation proceeds is made to the Preferred Shareholders and, therefore, Franklin Advisers argues it has satisfied the IRR Hurdle.

    Claimants, on the other hand, argue that the ambiguity as to the parties' intent is resolved by comparing the CLO II indenture to a prior CLO ("CLO I") for which Franklin Advisers

also served as collateral manager.  Claimants point to the
"Incentive Fee" of CLO I as the equivalent of the CCMF in CLO
II. (See Claimants' Memo at 21.)  The Incentive Management Fee
of CLO I is defined, in pertinent part, as:

> A fee of 0.25% per annum payable in an amount calculated
> under the Incentive Management Fee Calculation if on any
> Distribution Date the holders of the Class E Notes have
> received an Internal Rate of Return of 12.0% on the
> original principal amount of the Class E Notes for the
> period from the Closing Date to such Distribution Date
> (after taking into account any distributions made or to
> be made on the Class E Notes on such Distribution Date
> and all prior Distribution Dates in accordance with the
> Priority of Payments).

(Gotthoffer Affidavit, Ex. H at 23 (emphasis added).)
Claimants argue that the affirmative omission of the
parenthetical clause in CLO II demonstrates that the parties
to CLO II intended for such distribution payments not to be
included in the calculation of the CLO II IRR Hurdle.  (See
Claimants' Memo at 21.)  Yet, the Court is not persuaded that
the Claimants' comparison is dispositive of the ambiguity.
There is another material distinction between CLO I and CLO II
which is instructive to the analysis.  The CLO II Indenture
provides for calculation "from the Closing Date through such
Distribution Date," (Gotthoffer Affidavit, Ex. H at 16
(emphasis added),) whereas CLO I provides for calculation
"from the Closing Date to such Distribution Date."
(Gotthoffer Affidavit, Ex. H at 2 (emphasis added).)  It would
be reasonable to conclude that the replacement of "to such"

-21-

with "through such" was deemed to vitiate the need for the express parenthetical language of CLO I.

Further, Franklin Advisers asserts that employees of the Trustee also expected the CCMF to be paid upon a Redemption Date where the IRR Hurdle was met for the first time.  For example, Donna Burnett, one of the Trustee's attorneys, stated in an email written on February 8, 2007, shortly before the Redemption Date, "If the IRR reaches 12% on the final payment due on the Redemption Date, then that is the first time that the 'accrued' [CCMF] will be 'payable.'"  (See Katz Decl., Ex. 28.)

Lastly, Franklin Advisers contends that a model prepared by Merrill Lynch as underwriter (the "Merrill Model") demonstrates that the parties intended for the Redemption Date payments to be included.  (See Franklin Advisers' Memo at 14 (citing Katz Decl., Ex. 48 at 50:10 - 53:9).)  Claimants argue that the Merrill Model was designed to track a variety of hypotheticals, and thus the inclusion of final distribution date payments does not reflect what the parties intended to be memorialized in the Indenture.  (See Claimants' Opp. Memo at 22.)

2.   Industry Custom

Franklin Advisers argues that industry custom and practice demonstrate that its proffered interpretation is the

only reasonable one.  First, Franklin Advisers relies on Rick Caplan ("Caplan"), an expert who has worked on over a hundred CLOs in his career. (See Declaration of Rick Caplan in Support of Franklin Advisers' Motion for Summary Judgment at 3.) Caplan asserts that it is "standard in the industry ... that optional redemption date proceeds are included in calculating whether the equity holders have reached the IRR hurdle rate" and that this standard is "well understood among market participants." (Caplan Decl. at 25; see also Katz Decl., Ex. 44 at 262:20-263:6.)  Second, Raymond Check ("Check"), the drafter of the Indenture, and deal counsel to both the underwriter and the Issuers, testified that the definition of the CCMF in CLO II was intended to mean "through and including" and that this usage and interpretation is common in the industry.[9]  (See Katz Decl., Ex. 47 at 186:2-11.)

Claimants counter that there was no such industry custom in 2001.  To support their assertion, Claimants rely only on the testimony of Donald Uderitz ("Uderitz"), the Director of CDO Plus.  (See Claimants' Opp. Memo at 23.)  However, the Court finds that, because Uderitz was not offered as an expert witness, his lay opinion is only admissible if it is

---

[9]  In his deposition, Check stated "yes" in response to the question of whether the relevant CCMF phrase "was intended to mean through and including such distribution date?"  Check continued by saying, "[t]he common interpretation and usage in indentures is 'to' usually means to and excluding and 'through' normally means just what it says, through a stated date."  (Katz Decl., Ex. 47 at 185:22 - 186:7.)

"rationally based on the perception of the witness." Fed. R. Evid. 701.   Federal Rule of Evidence 701(a) ("Rule 701") requires that lay opinions be based on the witness's first-hand perceptions and be rationally derived from those first-hand perceptions.  Id.; see also U.S. v. Kaplan, 490 F.3d 110, 119 (2d Cir. 2007).  Uderitz testified that, prior to 2006, he did not have any experience with CLO transactions.  (See Katz Decl., Ex. 56 at 43.)   Accordingly, the Court finds that Uderitz's testimony is unreliable and inadmissible as to this issue.  See Helena Assocs., LLC v. EFCO Corp., No. 6 Civ. 0861, 2008 WL 2117621, at *5-6 (S.D.N.Y. May 15, 2008) (finding at summary judgment stage that lay opinion testimony must satisfy Rule 701).

  3. Timing of CCMF Payment

  Claimants further contend that, even if Redemption Date distributions were to be included in the IRR Hurdle calculations, this would entitle Franklin Advisers to payment of the CCMF only on the subsequent distribution date. (See Claimants' Memo at 19.)   Claimants argue that based on the Indenture's waterfall structure, the Preferred Shareholders would not technically have received a 12% internal rate of return until the funds reach step L of the Principal Waterfall.

Distributions according to the Principal Waterfall start at step A and continue as set forth in the Indenture through step L. (See Gotthoffer Affidavit, Ex. G at 164-66.) Payment of the CCMF is made at step J and payments to the Preferred Shareholders are made at step L. (Id. at 166.) Because the CCMF is to be paid before payments are distributed to the Preferred Shareholders, Claimants argue that the IRR Hurdle will not have been met at step J, and will be met only when the funds reach step L. (See Claimants' Memo at 19-20.) In response, Franklin Advisers asserts that the inclusion of payments at step L in the IRR Hurdle calculation at step J is possible because of the simultaneous calculation contemplated under the Indenture. (See Franklin Opp. Memo at 21-22.) Check, the drafter of the Indenture, testified that the Indenture provides for a simultaneous calculation of the CCMF and the payments to be made to the Preferred Shareholders lower down the Principal Waterfall. (See Katz Decl., Ex. 47 at 183-84.)

The Court finds that the Indenture plainly contemplates calculations such as the IRR Hurdle and CCMF calculations prior to the actual distribution of funds pursuant to the Waterfalls. In fact, § 11.1(e) of the Indenture provides, "[i]n connection with the application of funds to pay [CCMFs] in accordance with 11.1(a)(i)(O) and Section 11.1(a)(ii)(J),

no more than one Business Days [sic] after the Due Period
ending prior to such Distribution Date, the Collateral Manager
shall deliver to the Trustee a calculation of the amount
payable on such Distribution Date." (Gotthoffer Affidavit,
Ex. G at 166.)

    4.  <u>No Genuine Issue of Material Fact</u>

    Having reviewed the Indenture, the parties respective
contentions, and the extrinsic evidence, the Court is
persuaded that there is no genuine issue of material fact as
to whether the phrase "through such Distribution Date"
includes the final distribution payments upon an Optional
Redemption.  The Court concludes that there is no extrinsic
evidence that supports a resolution of the ambiguities in
favor of the Claimants' interpretation.  Claimants have not
offered any evidence tending to show that the word "through"
in the clause at issue is not to be interpreted to include
Redemption Date payments.  Rather, Claimants merely point to
the distinction between the language of CLO I and CLO II,
which the Court has found in fact to support Franklin
Advisers' proffered interpretation.

    The Court finds that the extrinsic evidence is thus one-
sided in favor of Franklin Advisers' interpretation and that
no reasonable jury could find for the Claimants on this issue.
Even where a contract is "ambiguous as to intent, summary

judgment is still proper when the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation." See SCS Communic'ns, Inc. v. Herrick Co., 360 F.3d 329, 342 (2d Cir. 2004) (internal quotation omitted). That the parties disagree as to the definition of the term "through" does not in itself create a question of fact sufficient to survive summary judgment. See Wards Co. Inc. v. Stamford Ridgeway Assocs., 761 F.2d 117, 120 (2d Cir. 1985) ("[W]ords do not become ambiguous simply because lawyers or laymen contend for different meanings"). Accordingly, the Court grants Franklin Advisers' motion for summary judgment, and denies Claimants' motion, as to whether the Indenture includes Redemption Date distributions in the IRR Hurdle calculation.

C.   CCMF Accrual

Having found that Franklin Advisers is entitled to a CCMF upon the Preferred Shareholders' Optional Redemption, the remaining issue is the calculation of the CCMF. Claimants contend that the CCMF accrues only when the IRR Hurdle is triggered, and thus if Franklin is entitled to a CCMF, it is only the amount which accrued on and after the Redemption Date. (See Claimants' Memo at 25.) Conversely, Franklin Advisers contends that the CCMF accrued from the closing date of CLO II, irrespective of whether the IRR Hurdle had been

-27-

met. (See Franklin Advisers' Memo at 7.)

    1.   The Indenture

The Indenture, in pertinent part, calls for the payment of "the accrued and unpaid [CCMF] (consisting of the CCMF accrued for the related Interest Accrual Period and any such fee accrued for prior Due Periods but not paid on any Distribution Date) that is payable on such Distribution Date." (Katz Decl., Ex. 1 at 16; Gotthoffer Affidavit, Ex. G at 16.)

The Court has reviewed the relevant sections of the Indenture and concludes that it is ambiguous as to whether the CCMF accrues from the closing date or only when the IRR Hurdle has been met. The last sentence of the Indenture's SCMF definition provides that "[t]he [SCMF] will accrue from the Closing Date whether or not currently payable" (Katz Decl., Ex. 1 at 54,) whereas the CCMF definition contains no such language. However, language governing the SCMF and CCMF is distinct throughout the Indenture and the Court has not found any unambiguous language in support of the Claimants' proffered interpretation.

The Interest Waterfall provides that step O –- the CCMF step -- is for the payment of "all accrued and unpaid CCMFs accrued on prior Distribution Dates," whereas the equivalent SCMF provision authorizes payment of "all accrued and unpaid [SCMFs] that were due and payable to the Collateral Manager on

-28-

prior Distribution Dates." (See Katz Decl. at 164 (emphasis added).)   The Article 11 language on the CCMF tracks the definition of the CCMF in § 1.1, which provides: "the accrued and unpaid [CCMF] (consisting of the CCMF accrued for the related Interest Accrual Period and any such fee accrued for prior Due Periods ...." (Gotthoffer Affidavit, Ex. G at 16.) Although the Court is persuaded that the distinction between the language governing the SCMF and the CCMF is of consequence, the Indenture language could reasonably be interpreted to have various meanings.   For example, the omission of "due and payable" in the language governing payment of the CCMF could indicate that the CCMF was due for each Due Period, regardless of whether the IRR Hurdle had been met.   However, the omission of the language "will accrue from the Closing Date whether or not currently payable" in the CCMF definition militates for the opposite conclusion. Further, the Indenture's definition of "Due Period" is not instructive as it merely refers to a calendar period and does not have any legally operative meaning.[10]   Accordingly, the Court finds that, as a matter of law, the Indenture is ambiguous as to whether the CCMF accrues from the closing date or from when the IRR Hurdle is met.

---

[10] The Indenture provides that "Due Period" is "the period commencing immediately following the seventh Business Day prior to the preceding Distribution Date ... and ending on the seventh Business Day prior to such Distribution Date."  (Katz Decl., Ex. 1 at 22.)

2.   <u>Extrinsic Evidence</u>

The Court will next consider whether the extrinsic evidence proffered is dispositive of the interpretive issue.

Franklin Advisers first argues that there is parol evidence that the parties intended for the CCMF to accrue from the closing date of CLO II.  MaryAnne Chase ("Chase"), a Franklin Advisers employee who was part of the negotiating team on CLO II, testified that she had a contemporaneous conversation with several Merrill Lynch employees on the accrual issue. (<u>See</u> Katz Decl., Ex. 45 at 206-07.)  Chase testified that her counterparts at Merrill Lynch, including Leigh Oblack ("Oblack"), said that the CCMF would accrue from the closing date.  <u>Id.</u>  Claimants, including Oblack herself, contest this recollection. (<u>See</u> Claimants' Opp. Memo at 14; Gotthoffer Affidavit, Ex. HH at 180-82.)  Oblack testified that she does not recall any conversation about accrual with Chase.  <u>Id.</u>  Accordingly, the Court finds that there is a genuine issue of material fact as to whether there were any contemporaneous conversations between the parties negotiating the Indenture on the accrual issue.

Franklin Advisers also points to an offering memorandum issued in July 2001 prepared jointly by Merrill Lynch and Franklin Advisers (the "Offering Memorandum").  The Offering Memorandum states unequivocally that the CCMF "will accrue for

-30-

each Due Period (whether or not payable on the related Distribution Date)." (Katz Decl., Ex. 3 at CD003215.) While Franklin Advisers offers this document as extrinsic evidence of the parties' intent, the Court is persuaded instead that the Offering Memorandum adds to the ambiguity concerning what exactly the parties intended. Since the parties clearly could have included the unambiguous language of the Offering Memorandum in the Indenture, but chose not to, the Court will not impose such a clause on the Indenture absent other evidence of the parties' intent.

Franklin Advisers further asserts that the Trustee's actions prior to the litigation is evidence of the parties' intent. The Trustee's model for payment of the CLO II Waterfalls provides for a running calculation of an accruing CCMF, regardless of whether or not the IRR Hurdle had been met. (See Franklin Advisers' Memo at 11; Katz Decl. at Ex. 60.) Claimants counter that the Trustee's model does not evidence the parties' intent because the Trustee was not involved in the negotiation of the CCMF. (See Claimants' Opp. Memo at 17.) Further, Claimants cite the testimony of a BNY employee, Maria Calzado, who testified that BNY's "tracking" the accrual of the CCMF did not reflect BNY's opinion on the issue and was instead just a hypothetical calculation that was

performed as a matter of course. (Gotthoffer Affidavit, Ex. AA at 100-01.)

Lastly, Franklin Advisers asserts that it was industry custom for the CCMF to accrue from the closing date. Franklin Advisers cites its own expert, Caplan, and several witnesses who testified that accrual from closing was the industry standard. (<u>See</u> Franklin Advisers' Memo at 8.) However, the Court is not persuaded that Franklin Advisers has demonstrated that the alleged custom was certain and objectively fixed.

> Under New York law, evidence of custom and usage must establish that (1) the term in question has a fixed and invariable usage and (2) that the party sought to be bound was aware of the custom, or that the custom's existence was so notorious that it should have been aware of it.

<u>SR Int'l Bus. Ins. Co., Ltd. v. World Trade Center Props., LLC</u>, 467 F.3d 107, 134-35 (2d Cir. 2006) (citations and quotations omitted). Among the witnesses Franklin Advisers cites is Joshua Raff ("Raff"), its deal counsel on CLO II. (<u>See</u> Franklin Advisers' Memo at 8.) However, when asked directly "was there an industry practice, to your understanding in 2001, as to from what point, if any, an unearned [CCMF] accrued?," Raff answered "[n]ot to my knowledge." (Katz Decl., Ex. 53 at 69:18-24.) Further, another of Franklin Advisers cited witnesses, Charles Thompson, testified that "in a typical transaction [contingent management fees] would accrue, but you know, each transaction

is different." (Katz Decl., Ex. 55 at 51:3-9.)  Accordingly, the Court finds that there is a genuine issue of material fact as to whether there was such a fixed and invariable trade usage, or whether the accrual of CCMFs in CLO transactions was so widely known or accepted that all parties should have been aware of it.

The Court is not persuaded that Franklin Advisers' extrinsic evidence demonstrates that no reasonable jury could find that the CCMF accrues only when the IRR Hurdle has been met.  Accordingly, the Court denies Franklin Advisers' motion for summary judgment as to this issue.

The Court is also not persuaded that Claimants have demonstrated that no reasonable jury could find that the CCMF accrues from the closing date.  Claimants point primarily to the distinction between the Indenture's governing language for the distribution of the SCMF and CCMF, described above. Further, Claimants cite the Offering Memorandum as evidence of their contention that the CCMF was to accrue only when the IRR Hurdle was met.  Claimants assert that the Offering Memorandum was "incomplete and widely inconsistent" and provided for payment of both the SCMF and the CCMF only when "due." (Claimants' Memo at 24.)  But, as noted above, the Court finds that the meaning of "due" in this context is ambiguous.

Having provided no further extrinsic evidence demonstrating that it would be unreasonable to conclude that the CCMF accrued from the closing date of CLO II, Claimants' motion for summary judgment as to this issue is also denied.

## IV. ORDER

_____For the reasons stated above, it is hereby

**ORDERED** that the motion for summary judgment (Docket No. 113) of defendant Franklin Advisers, Inc. ("Franklin Advisers") as to whether a CCMF can be paid upon an optional redemption is GRANTED; and it is further

**ORDERED** that the motion for summary judgment of defendant Franklin Advisers as to whether the distributions to preferred shareholders upon an optional redemption are included in determining whether preferred shareholders have received a 12% internal rate of return is GRANTED;

**ORDERED** that the motion for summary judgment of defendant Franklin Advisers as to whether the contingent collateral management fee accrues from the closing date of CLO II is DENIED; and it is further

**ORDERED** that the motion for summary judgment (Docket No. 114) of defendants CDO Plus Master Fund, Ltd and Merrill Lynch, Pierce, Fenner & Smith is DENIED in its entirety; and it is finally

**ORDERED** that a conference is scheduled for December 11, 2009 at 9:45 a.m. to discuss preparations for trial of remaining disputes.

**SO ORDERED.**

Dated:     New York, New York
           25 November 2009

VICTOR MARRERO
U.S.D.J.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11-25-09

-35-